167 So.2d 95 (1964)
CITY OF JACKSONVILLE, a municipal corporation under the Laws of Florida, Appellant,
v.
George SCHUMANN et ux., et al., Appellees.
No. F-297.
District Court of Appeal of Florida. First District.
August 18, 1964.
Rehearing Denied September 18, 1964.
*96 William M. Madison; Claude L. Mullis and Joe R. Young, Jr., Jacksonville, for appellant.
Duss, Butler & Nelson, Jacksonville, for appellees.
CARROLL, DONALD K., Acting Chief Judge.
The defendant city in an action for "inverse condemnation" has filed this interlocutory appeal from an order entered by the Circuit Court for Duval County, denying its motions to dismiss and strike addressed to the plaintiff's second amended complaint.
In this appeal the principal question before us for determination is whether the said complaint sufficiently alleges a cause of action against the defendant. A secondary question is whether certain portions of the said complaint should have been stricken pursuant to the defendant's said motion to strike.
The basic allegations of the plaintiffs' second amended complaint are substantially as follows: That the plaintiffs, 57 in number, are the owners of lands on which they reside, in close proximity to the Imeson Airport, which is owned and operated by the defendant, a municipal corporation. That the city, commencing during World War II and thereafter, embarked upon a program of expanding the airport, acquiring additional lands both by purchase and by condemnation, some of it lying between the plaintiff's properties and the original airport location. That in 1962 the city completed an extension of the Northeast-Southwest main runway, under the directives and requirements of the Federal Aviation Agency for instrument runways, in order that the airport would become fully qualified to handle airplanes, both military and commercial, propelled by turbo-jet engines. That the Northeast end of this extension of the runway abuts a county road running through the plaintiffs' residential area and the approach to that end bisects the said road, so that the said area has been severed and cut into two parts, lying on either side of the end of the extended runway. That the city provides facilities at the airport for the Florida Air National Guard, and maintains a squadron of jet fighter pilots who currently fly military fighter planes "which are the fastest and most powerful (and consequently noisiest) fighter planes in the world." That the city also provides landing and take-off facilities for several commercial airlines, which daily operate approximately 90 flights in and out of the airport, at all hours of the day or night, using jet transport planes, most of them four-engined.
The plaintiffs further allege in their said complaint: That the said planes, both military and commercial, are operated every day through the air space above the plaintiffs' properties, at altitudes usually below 500 feet, the most common altitude being between 100 and 150 feet, with some flights below 100 feet. That all of the plaintiffs' said properties are within the area designated and defined by the Federal Aviation Agency as "Area Recommended for Non-Residential Development and The Exclusion of Places of Public Assembly" in the Aircraft Noise Abatement Guide, published by the said agency in 1960 for the use and *97 guidance of airport owners and operators who desire to provide airport facilities for the operation of jet-propelled aircraft.
The plaintiffs then allege in their second amended complaint that, by reason of the close proximity of the plaintiffs' properties, jet aircraft operated by the said Air National Guard and the said commercial airlines at times pass over the said properties at altitudes below 500 feet, the greater number of flights occurring at altitudes ranging from 100 to 150 feet; that while the said aircraft pass over the said properties or in close proximity thereto, and while landing, taking off, and warming up, and particularly while advancing the engines to near maximum power on the warm-up pads and taxiing strips appurtenant to the runways, the aircraft engines cause to be heard and felt "terrific and overwhelming vibrations, concussions and sound waves directed and transmitted from said engines" against and upon the plaintiffs' properties; that there are also emitted from the said engines "exhaust fumes, fuel gasses and heavy black smoke which are directed and transmitted" against and upon the said properties, which gasses, fumes, and smoke carry with them "dust, debris, earth, and stones" which are propelled against and upon the said properties; that the said vibrations and concussions cause dishes and windows to rattle in the plaintiffs' homes and make it impossible for the plaintiffs and members of their families to carry on any conversation, and on occasion have caused structural damage to the plaintiffs' residences and have caused objects to fall from tables and shelves.
On the subject of damages the plaintiffs allege in their said complaint that the above conditions occur at all hours of the day and night and at all times during the week, to the permanent injury and damage to their properties; that they are unable to secure an uninterrupted night's sleep due to the irregularity of the said flights of jet planes; that the plaintiffs have suffered great physical and mental discomfort, fear, and distress from the operations of the airport, particularly since the advent of jet planes, and the value of their properties "as residences or other use requiring the presence of human beings or animals has been destroyed." The plaintiffs re-aver their allegation that all of their properties are within the area recommended by the Federal Aviation Agency as not suitable for residential development.
In paragraph numbered V of their said complaint, the plaintiffs reveal what they conceive to be the nature of their cause of action against the defendant city, as follows:
"As a direct and proximate result of the increased operation of jet planes from Defendant's Imeson Airport, which increased operation has taken place within the past two years, the Defendant has deprived the Plaintiffs of the free and unmolested use and quiet enjoyment of their respective properties, and Defendant has, by so doing, exercised dominion and control over, appropriated, confiscated and condemned the properties of the Plaintiffs, without just compensation, and without due process of law, contrary to the Constitution and laws of the State of Florida and of the United States of America."
In paragraph VI of their said complaint the plaintiffs allege that by reason of the above-described conditions and of the depriving of the plaintiffs of their free and unmolested use and quiet enjoyment of their properties, and of the "confiscation and condemnation of their properties by the defendant the Federal Housing Administration and the Veterans' Administration" will not insure or guarantee any loan to any person to buy, build, or construct any home or other building on the plaintiffs' properties, and "no bank or other prudent lending institution will make a loan to any person for such purposes," and that: "By reason of these conditions, plaintiffs' properties have been condemned and made useless, as residential property, by the defendant, without *98 due process of law, contrary to the Constitution and laws of the State of Florida and of the United States of America."
In paragraph VII the plaintiffs allege that, in conjunction with the defendant's expansion of the airport and in pursuance to a resolution adopted by it, the defendant had filed in the Duval County Circuit Court a condemnation action against certain of the plaintiffs, seeking to take an easement consisting mainly of the right to enter upon the properties of the said plaintiffs for the purpose of cutting trees and removing other obstructions above a certain height over their properties for the purpose of maintaining a clear zone for the flight of aircraft  the so-called "clearance easement"  but the said plaintiffs cannot in that action compel the city to condemn more property or any greater interest.
Finally, in the eighth and last paragraph of their said complaint, the plaintiffs allege that the operation of the said airport, as expanded by the defendant, "constitutes a continual trespass against the properties of the plaintiffs, or a nuisance equivalent to the imposition of a servitude upon the properties of the plaintiffs. Plaintiffs are thus irreparably injured, and their only relief is in equity."
The prayer of the plaintiffs at the conclusion of their complaint is as follows:
"WHEREFORE, Plaintiffs pray that an injunction issue against the Defendant prohibiting further continuance of the trespass or nuisance, or in the alternative that the Defendant be required to exercise its right of eminent domain as a means of making restitution to the Plaintiffs, and each of them, and that the Defendant pay to the Plaintiffs such attorney's fee as to the Court seems reasonable."
To the foregoing second amended complaint the defendant city duly filed its motion to dismiss and motion to strike. The stated ground for its motion to dismiss is that the said complaint fails to state a cause of action against the defendant. In its motion to strike the defendant moves to strike paragraphs IV and V of the said complaint and certain parts of paragraph IV on the grounds that the said allegations are "redundant, irrelevant, immaterial and seek to assert improper elements of damage against this defendant." From the order of the Circuit Court denying the defendant's said motions to dismiss and to strike, the defendant has taken the instant interlocutory appeal.
While the plaintiffs' second amended complaint does not contain the expression "inverse condemnation," it is apparent from the allegations of the complaint, and it is clear from the statements and contentions made by the plaintiffs in their appeal brief, that they are attempting to allege in their complaint a cause of action in inverse condemnation, as an alternative to the remedy of injunctive relief. This effort makes this a case of first impression in Florida, for we know of no decision in this state specifically recognizing inverse condemnation based upon airport operations.
In several jurisdictions, both state and federal, the courts have upheld inverse condemnation as a legally-recognizable cause of action, and it is our problem in the present appeal to determine whether such a cause of action should be recognized in the courts of Florida.
Inverse condemnation has been defined as the popular description of a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency. Thornburg v. Port of Portland, 233 Or. 178, 376 P.2d 100 (1962); Martin v. Port of Seattle, 391 P.2d 540 (Wash. 1964). To the same effect but using different words, the New York Supreme Court, Appellate Division, in Trippe v. Port of New York Authority, 17 A.D.2d 472, 236 N.Y.S.2d 312 (1962) said that inverse condemnation is a method of compensation wherein "an owner asserting *99 a claim for appropriation of his property may pursue his right by an action in equity for an injunction, and for damages; the court may then, as an alternative to the injunction, make an award for the taking * * *."
Apparently the leading case decided by the state courts involving an action for inverse condemnation against an airport authority charging a taking on account of a noise nuisance, is Thornburg v. Port of Portland, 233 Or. 178, 376 P.2d 100, decided by the Supreme Court of Oregon in 1962. In that case the plaintiffs owned and resided in a dwelling house located about 6,000 feet beyond the end of a certain airport runway and directly under the glide path of aircraft using it, and about 1,500 feet beyond the end of a second runway, but about 1,000 feet to one side of the glide path of aircraft using that runway. This action in inverse condemnation was brought by the plaintiffs against the Port of Portland, which owned and operated the airport in question, the Portland International Airport. The defendant had the power of eminent domain and had used it to surround itself with a substantial curtilege, but its formal acquisition stopped short of the plaintiffs' land. The plaintiffs contended that flights from both of the said runways had resulted in a taking of their property. Their principal complaint was that the noise from jet aircraft made their land unusable. The two theories of their case were: that systematic flights directly over their land cause a substantial interference with their use and enjoyment of their land, which interference constitutes a nuisance, a continuing nuisance which, when maintained by government, amounts to the taking of an easement, or, more precisely, presents a jury question whether there is a taking; and, secondly, that systematic flights which pass close to their land but not directly over it, constitute the taking of an easement, for the same reasons. At the trial the jury denied to the plaintiffs the compensation which they sought in their action, and the plaintiffs appealed.
In a scholarly opinion in the Thornburg case, the Supreme Court of Oregon said that the specific question before it was "whether a noise-nuisance can amount to a taking." In discussing decisions involving this point, the court further said:
"Since United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and particularly since Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), we know that easements can be taken by repeated low-level flights over private land. Such easements have been found in actions against the federal government (Causby) and in actions against municipal corporations (Griggs). When such easements are said to have been taken, compensation must be paid to the owners of the lands thus burdened. This much appears to be settled."
After a learned discussion of the authorities on the subject of the noise of jet aircraft amounting to a nuisance and such nuisance ripening into a "taking," the Oregon Supreme Court in the Thornburg case reached the following judicial conclusion:
"If we accept, as we must upon established principles of the law of servitudes, the validity of the propositions that a noise can be a nuisance; that a nuisance can give rise to an easement; and that a noise coming straight down from above one's land can ripen into a taking if it is persistent enough and aggravated enough, then logically the same kind and degree of interference with the use and enjoyment of one's land can also be a taking even though the noise vector may come from some direction other than the perpendicular.
"If a landowner has a right to be free from unreasonable interference caused by noise, as we hold that he has, then when does the noise burden become so unreasonable that the government must pay for the privilege of being permitted to continue to make the *100 noise? Logically, the answer has to be given by the trier of fact (subject to the usual exercise of the proper function of the court in screening the evidence). See Restatement, Torts, § 826, Comment d."
The judgment appealed from was then reversed and the cause remanded for a new trial.
An even more recent case in the state courts involving an action for inverse condemnation against an airport operator on account of the operations of jet aircraft is Martin v. Port of Seattle, 391 P.2d 540 (Wash. 1964). As in the case before us, the question confronting the Supreme Court of Washington was whether the plaintiffs therein had stated a claim for relief against the municipal corporation as the owner of an airport. The defendant was the Port of Seattle, owner of the Seattle-Tacoma International Airport, and the plaintiffs were property owners who sought, through this action, damages for the taking or damaging of their property for public use caused by nearby low altitude flights of jet aircraft landing and taking off from the said airport, resulting in a decline in the market value of their properties. The northernmost edge of the litigated area was approximately nine-tenths of a mile from the end of a certain runway, and jet aircraft in the process of landing passed over the central part of the area at altitudes of less than 500 feet. The lands of some of the plaintiffs were subjected to direct overflights of the jet aircraft, while other plaintiffs suffered no overflights. The Washington Supreme Court stated that the gravamen of the plaintiffs' complaint was the noise and vibration created by the jet aircraft rather than the physical invasion. The plaintiffs claimed that, when the said aircraft passed over or in close proximity, conversation is halted, sleep is disrupted, fear is caused, etc., by the noise, and the vibration in the houses makes it necessary periodically to hammer back nails into sidings and to tighten light fixtures, etc. The Supreme Court of Washington agreed with the lower court that the plaintiffs' complaint stated a claim for relief against the defendant, and affirmed the judgment appealed from.
In its discussion of the authorities in this field of law in the Martin case, the Supreme Court of Washington had this to say about the nature of the cause of action in the litigation before it:
"Whether the `cause of action' for the recovery of compensation is viewed as resulting from the due process provisions of the Constitution, or as resulting from an adaptation of older ideas of eminent domain and the condemnation of private property for public use, is of little significance. When the noise and intense vibration produced by low-flying jet aircraft deprives the owner of land of an essential element in his relationship to that land, the result should be the same whether the airport operator himself brings the action to `condemn' the right to so interfere with the land, or the landowner is forced to be the moving party."
In both of the Oregon and Washington cases which we have just discussed, the courts cited and relied upon the following two landmark decisions of the United States Supreme Court:
In the United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1945), the United States Supreme Court held that repeated flights of aircraft at such proximity to the ground as to render property uninhabitable and diminish its value constituted a taking, notwithstanding the fact that the aircraft in their path of glide to and from an airport had conformed to the thirty-to-one glide angle approved by the Civil Aeronautics Authority. The Supreme Court stated that it was a case of first impression and that the problem presented was whether the respondents' property was taken within the meaning of the Fifth Amendment by frequent and regular flights of army and navy aircraft over the respondents' land at low altitudes. The respondents, *101 Causby and his wife, owned land near an airport leased to the United States in North Carolina, on which land stood thier dwelling house and various out-buildings which were mainly used for raising chickens. The Causbys filed this action against the United States in the U.S. Court of Claims to recover for the alleged taking of their property without compensation by flying airplanes across it at such height as to interfere with its normal use. The Court of Claims rendered judgment for the Causbys, and the United States sought review by certiorari in the Supreme Court. The evidence showed that the flights in question interfered with the normal use of the Causbys' property as a chicken farm and interfered with the night rest of the Causby family. About 150 of their chickens were killed by flying into walls from fright. Production also fell off. The result was the destruction of the property as a commercial chicken farm.
In the Causby case the United States Supreme Court gave the following as its reasoning leading to its conclusion that there had been a taking of the Causbys' property within the meaning of the Fifth Amendment to the Constitution of the United States:
"We would not doubt that if the United States erected an elevated railway over respondents' land at the precise altitude where its planes now fly, there would be a partial taking, even though none of the supports of the structure rested on the land. The reason is that there would be an intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it. While the owner does not in any physical manner occupy that stratum of airspace or make use of it in the conventional sense, he does use it in somewhat the same sense that space left between buildings for the purpose of light and air is used. The superadjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. We think, that the landowner, as an incident to his ownership, has a claim to it and that invasions of it are in the same category as invasions of the surface."
A somewhat analogous situation was before the Supreme Court in the later case of Griggs v. County of Allegheny, 82 S.Ct. 531, 369 U.S. 84, 7 L.Ed.2d 585 (1962). Griggs had instituted eminent domain proceedings in the Court of Common Pleas of Allegheny County, State of Pennsylvania, which held that there had been a taking by the county, which owned and operated an airport, of an air easement over his property, and fixed compensation therefor. The Supreme Court of Pennsylvania on appeal (County of Allegheny v. Griggs, 402 Pa. 411, 168 A.2d 123 (1961), held that, if there had been a taking, the county was not liable, and Griggs sought review of this reversal by certiorari in the U.S. Supreme Court, which reversed and held that the interference with Griggs' property amounted to a taking, in the constitutional sense, of an air easement for which compensation must be paid by the county, the owner and operator of the airport (the Greater Pittsburgh Airport).
In the Griggs case, one "approach area," as designed by the county, to the northeast runway passed over Griggs' home, which was 3,250 feet from the end of the said runway. The "slope gradient" of the approach area provided a clearance of 11.36 feet between the bottom of the glide angle and Griggs' chimney. The low-altitude overflights caused Griggs and the occupants of his property to become nervous and distraught, their sleep was disturbed, etc.
After discussing and re-affirming its holding in the Causby case, supra, the Supreme Court in the Griggs case said the following on the question as to who took the air easement in the constitutional sense:
"It is argued that though there was a `taking,' someone other than respondent was the taker  the airlines or the *102 C.A.A. acting as an authorized representative of the United States. We think, however, that respondent, which was the promoter, owner, and lessor of the airport, was in these circumstances the one who took the air easement in the constitutional sense. Respondent decided, subject to the approval of the C.A.A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed."
In the final three sentences of its opinion, however, the Supreme Court uses language that we think touches the very heart of the concept of inverse condemnation:
"Without the `approach areas,' an airport is indeed not operable. Respondent in designing it had to acquire some private property. Our conclusion is that by constitutional standards it did not acquire enough."
Reverting now to the case before us on this appeal, we think that the allegations in the plaintiffs' second amended complaint fall squarely within the rules laid down in the above-discussed four decisions of the Supreme Court of Oregon, Washington, and the United States, as averring a constitutional taking of their property, requiring the payment to them of just compensation by the owner and operator of the airport. The facts alleged in the plaintiffs' said complaint, are, we believe, substantially the same as the basic facts involved in the said four decisions. This being so, the sole remaining inquiry is whether there exists any legal reason why the rules recognized in those decisions should not be recognized and applied in Florida. We see no such reason.
This is a case of first impression in this State. We know of no Florida case specifically recognizing inverse condemnation based upon airport operations, although this court in our recent decision in Corbett v. Eastern Air Lines, 166 So.2d 196, we adverted to that type of action by way of pure obiter dictum.
The constitutional provisions applicable in Florida are consistent with, if they do not affirmatively require, the recognition of the concept of inverse condemnation. In addition to the provisions of the United States Constitution applied in the Causby and Griggs decisions, Section 4 of the Declaration of Rights in the Constitution of Florida, F.S.A. provides: "All courts in this State shall be open, so that every person for any injury done him in his lands, goods, person or reputation shall have remedy, by due course of law, and right and justice shall be administired with out sale, denial or delay." Section 12 of the Declaration provides in pertinent part: "No person shall * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken without just compensation. * * *"
On the subject of condemnation Section 29 of Article XVI of the Florida Constitution, F.S.A. provides in pertinent part: "No private property, nor right of way shall be appropriated to the use of any corporation or individual until full compensation therefor shall be first made to the owner, or first secured to him by deposit of money * * *."
The concept of inverse condemnation can be readily accepted if we acknowledge the doctrine that a continuing trespass or nuisance may ripen into a constitutional taking of property within the ken of constitutional provisions prohibiting the taking of property without the payment of just compensation. Such a doctrine has been recognized in several decisions of the appellate courts of Florida.
For instance, in State Road Department of Florida v. Tharp, 146 Fla. 745, 1 So.2d 868 (1941), the owner of a water mill filed a suit to restrain the continuing of a trespass by the State Road Department which had erected a bridge and a fill which obstructed channels in which water flowed *103 after it left the millrace, resulting in raising the elevation of the water in the millrace and in reducing the mill's capacity, or to require the department to exercise its right of eminent domain as a means of making restitution to the owner. The said owner contended that the building and maintenance of the fill amounted to a taking of his property without due process of law. The chancellor declined to issue the injunction, but granted to the department the privilege of exercising the right of eminent domain as a means of making restitution to the owner. A motion to dismiss was denied and on final hearing the chancellor granted the relief prayed for; and the department appealed.
In affirming the chancellor's decree in this Tharp case, the Supreme Court of Florida, speaking through the late Justice Terrell, said the following with respect to the basic constitutional issues involved:
"If a State agency can deliberately trespass on and destroy the property of the citizen in the manner shown to have been done here and then be relieved from making restitution on the plea of nonliability of the State for suit, then the constitutional guaranty of the right to own and dispose of property becomes nothing more than the tinkling of empty words. Such a holding would raise administrative boards above the law and clothe them with an air of megalomania that would eternally jeopardize the property right of the citizens. It would reverse the order of democracy in this country and head it into a blind alley.
"American democracy is a distinct departure from other democracies in that we place the emphasis on the individual and protect him in his personal property rights against the State and all other assailants. The State may condemn his property for public use and pay a just compensation for it, but it will not be permitted to grab or take it by force and the doctrine of nonsuability should not be so construed. Forceful taking is abhorrent to every democratic impulse and alien to our political concepts.
"If American democracy survives and lives up to the function of its creation, it must do so by adherence to the code of moral and legal conduct promulgated by the Constitution, one provision of which is the sanctity of private property. No principle has contributed more to the material development of the country or done more to stabilize and balance its citizenship. To be a property owner and a taxpayer is one of the surest incentives to a dependable citizenship. It gives the citizen a stake in his government second to no other influence. It is one of the first duties of constitutional government to protect, and where the sovereign has a right to condemn for public use, it will not be permitted to appropriate except by orderly processes. The current of the law on this point will not lead to any other conclusion.
"Supporting this thesis, Section 12 of the Declaration of Rights provides that no person shall be deprived of his property without just compensation and Section 29 of Article 16 of the Constitution contains a similar specification with reference to corporations and individuals for the preservation of property rights. The latter provision is mandatory that the compensation be made before the property is appropriated."
On the authority of the just-quoted decision of the Supreme Court of Florida, the above-quoted provisions of the Florida Constitution, and the above decisions from other jurisdictions, we hold that in the present case the allegations of the plaintiffs' second amended complaint are sufficient to state a claim for relief  either injunctive relief or by way of inverse condemnation  *104 so that the chancellor correctly denied the defendant's motion to dismiss the said complaint. We also hold that the complaint's allegations attacked by the defendant's motion to strike are both relevant and material to the plaintiffs' cause of action, so that the chancellor correctly denied that motion also. Consequently, the order appealed from herein must be and it is
Affirmed.
WIGGINTON and RAWLS, JJ., concur.