**BENITEZ, et al v. HILLSBOROUGH COUNTY AVIATION AUTHORITY.**

No. 139928.

Circuit Court, Hillsborough County.

January 18, 1966.

54

Thomas A. Clark, Tampa, for plaintiffs.

Stewart C. Eggert, Tampa, for defendant.

JOHN G. HODGES, Circuit Judge.

*Findings of fact, discussion, conclusions of law and final decree:*
After many hearings and arguments on the legal sufficiency of the
pleadings, this case came on for trial before the court, sitting with-
out a jury, during the week of August 23, 1965. In the suit, plaintiff
residential landowners seek inverse condemnation relief. They ask
the court to require the defendant aviation authority, hereinafter
referred to as the authority, to condemn an avigational easement
over their properties, asserting that there has been an appro-
priation by the authority of the airspace above their homes. The
authority has denied that there has been a taking and has asserted
affirmative defenses of the statute of limitations, prescription, or
laches.

The court has heard voluminous testimony from the landowners,
an aeronautical engineer, an audiologist, real estate appraisers,
officials of the authority, and others, and has considered copious
documentary evidence in the form of photographs, maps, charts
and tables bearing upon the matter. The court has also personally

visited plaintiffs' properties where it has observed the flight of aircraft and listened to noises therefrom, both inside and outside of the homes occupied by the plaintiffs. The court has been assisted in its judicial struggle by pertinent and tenacious argument of able counsel, who have also furnished the court with comprehensive supporting briefs citing all of the important decisional case law bearing upon the issues presented.

Based upon the foregoing, the court makes and enters the following —

### Findings of fact

1. The Hillsborough County Aviation Authority is a public body corporate created by the legislature of the state of Florida. It has the power of eminent domain. It operates the Tampa International Airport which currently serves in excess of 1,500,000 passengers per year (T. 161). In 1964 the airport experienced more than 111,000 landings and takeoffs, of which approximately 70,000 were carrier operations (T. 159). Landings and takeoffs of aircraft at the airport are functions controlled by the authority and the Federal Aviation Agency (T. 283). The defendant does not control the flight of aircraft over or near the plaintiffs' property (T. 292).

2. Apparently the airport had its beginning in the 1920's as a private airport. Then, during World War II, it became a United States Army installation designated as Drew Field and was used principally as a B-17 bomber base. After the war, the airport was conveyed to the city of Tampa. Thereafter it was leased on a long term basis to defendant authority. It has been used as the area's commercial airport since 1945. Defendant authority in its own name has acquired certain additional properties, none of which is involved here, and for all practical purposes the defendant authority controls and maintains the airport. Until 1960, only propeller or prop-jet airplanes used the facility, but in May of 1960 the first pure jet plane flew into the airport and landed. Since that time the number of jets has gradually increased until 1964 when the number of flights apparently leveled off, but the number of passengers increased.

3. Tampa International Airport has two north-south runways and the one east-west runway which is here involved. The westernmost north-south runway is 8,700 feet long, the easternmost north-south runway is 8,300 feet long and the east-west runway is 6,995 feet long. All of the runways are 150 feet wide (T. 184). The north-south runways are the dominant runways and are used the greater part of the time. The north-south runways are also the only runways which are instrumented. The preferential use of the runways is established by a RAPCON letter issued by the Federal

Aviation Agency and this use is as follows — when the wind is under 5 knots the north-south runways are to be used exclusively, when the wind is between 5 and 15 knots the north-south runways are to be used except if the wind is blowing within ten degrees north or south of due east or within ten degrees north or south of due west, in which event the east-west runway is to be used. However, it frequently happens that the pilots will request a given runway to better insure the safety of their passengers and, if such a request is made, the Federal Aviation Agency generally grants the request (T. 719). The north-south runway system is the instrumented system principally due to the fact that the Federal Aviation Agency, exercising its aircraft control function, made determinations as to the predominant winds which exist and prevail at the airport. This study caused the Federal Aviation Agency to determine that the primary instrument approach to the airport should be from the north to the south. Such a determination was made before the construction of the new north-south runway, and since the construction of that new runway, the Federal Aviation Agency has designated it as an instrument runway and has made it eligible for federal aid for high intensity lighting and other instrumentation (T. 763). Modern jet aircraft will in the future be able to cope with even greater crosswinds on landing (T. 276).

4. The ends of each of the runways at the airport include a trapezoidal area which is referred to as a "clear-zone". It is an area which must be controlled by the defendant and kept clear of obstruction. Should an airplane undershoot a runway, chances are almost 100% that it will be in this particular clear-zone area. In regard to the clear-zone area off of the east end of the east-west runway at the airport, the easternmost portion of the clear-zone area goes up to Dale Mabry Highway which would mean that the east end of the clear-zone area would be in excess of 1,500 feet from any of the properties of the plaintiffs.

5. The plaintiffs' properties are located in Tampa, lying east of the east-west runway of the airport. With the exception of the Castillo residence, the properties lie between Ivy St. on the south and Abdella St. on the north. A projection of the center line of the east-west runway would extend between Ivy and Abdella streets. The Castillo property lies on the south side of Ivy. The jet planes using the east end of the east-west runway fly directly over the properties of most of the plaintiffs. (T. 70, 190, 205, 223, 311, 313, 609, joint exhibit 1-A).

6. The properties of the plaintiffs lie at a distance of 4,233 feet to 5,405 feet from the east end of the east-west runway. There are no residences between the end of the runway and the residence of the plaintiff Diaz, whose house is the closest of the plaintiffs to

the runway (joint exhibit 1-A; exhibit C to pre-trial order).

7. The commercial jet airplanes approach upon landing plaintiffs' properties at a height of from 250 feet to 500 feet (T. 616).

8. Tampa International Airport is classified as an international airport, signifying that it is the largest type of airport in the country and is designed to accommodate international and intercontinental routes. It represents an investment of over eleven million dollars since 1958, and is considered to be an important asset to the economy of the Tampa Bay and surrounding areas (T. 771). The authority plans at a cost in excess of 25 million dollars (T. 772), a new terminal complex at the airport to accommodate the anticipated increase in passengers and cargo (T. 168). There was no evidence that the east-west runway is to be extended, although a master plan introduced into evidence contained a recommendation that the east-west runway be extended for a distance of approximately 1,200 feet in the direction of plaintiffs' properties (T. 234). This recommendation has not been followed nor was there evidence that it would be adopted in the future. There was no evidence at the trial that indicated any intention on the part of the authority to relocate the airport or runways, but on the contrary there was every indication that it will operate in its present location indefinitely in the future. The east-west runway was established, designed and constructed by the United States Government when the airport was used as a bomber base. It is the same length and width now as it was when established.

9. Airplanes flying over Tampa are required by the Federal Aviation Agency to remain at a height of 1,500 feet or in excess thereof unless they are in the process of landing or taking off (T. 714). The sound of the aircraft at plaintiffs' properties is far in excess than that heard by Tampans when the same planes are flying above the city at 1,500 feet or above.

10. Plaintiffs, with a few exceptions, had no complaints of interference with the use and enjoyment of their properties until the advent of the jet planes. Several plaintiffs moved into their property after some jets were used at the airport, but before their frequent use and prior to the date of the alleged taking. They were the plaintiffs Harlow, Pereda, Perez and Rosette. All of the plaintiffs, except Drew, moved into their property after propeller-driven aircraft were used at the airport.

11. Noise is unwanted sound. All of the sounds emitted from aircraft over or near the plaintiffs' property are unwanted by the plaintiffs, and constitute noise. Sound is measured in terms of decibels and is a logarithmic unit. This means that 110 decibels is about seven times greater than 100 decibels because of the

logarithmic relationship (T. 342, 344). The decibel is intended to express the pressure exerted by sound waves and the greater the pressure the louder is the sound which is spoken of as its intensity. The frequency of waves per second affects the loudness of the sound. Generally speaking, eighty decibels put out by a base fiddle would be far less annoying and therefore considered far less loud than an 80 decibel tone put out by a violin E string (T. 356). The combination of intensity and frequency is measured in what is known as perceived noise levels or pndb (T. 366).

Certain sounds, and their relative intensities, which are generally considered to be objectionable would be — a train passing a station or an elevated train directly overhead, about 100 decibels; an automobile horn in close proximity, about 120 decibels; a pavement breaker, about 130 decibels.

12. Propeller aircraft generally produce sounds of lower intensity and frequency than jet aircraft. The frequency of propeller aircraft is in a lower frequency band than that of jets (T. 376).

13. When jets were flying ever plaintiffs' properties and using the east-west runway, 29 sound level meter readings were taken at plaintiffs' properties, 9 being between 90 and 100 decibels and 20 being between 100 and 112 decibels (T. 408).

The effect of the landing of the jet aircraft and the noise emitted therefrom was stated by the various plaintiffs to affect them in the following ways —

(a) Conversations are impossible. (T. 11, 27, 62, 69, 206, 222, 301, 308, 312, 317, 463, 608, 618).

(b) Television reception is disturbed (T. 13, 28, 42, 62, 69, 190, 206, 222, 301, 308, 312, 317, 463, 609, 618).

(c) Sleep is interrupted. (T. 28, 40, 68, 207, 222, 308, 312, 609).

(d) Children run into their houses from the yard. (T. 11, 27, 463, 612).

(e) Fear is aroused. (T. 12, 63, 74, 222, 317, 620).

(f) A residue is deposited upon clothes hanging out to dry. T. 29, 302, 463).

(g) Plaintiffs become nervous or cross and unable to relax. (T. 39, 62, 222, 301, 609).

(h) A vibration occurs, causing nails to loosen. (T. 44, 46, 302, 464, 614, 207, 317, 619).

(i) It is difficult to entertain company because of the interruptions. (T. 62, 312).

(j)  Telephone conversations are interrupted. (T. 11, 27, 62, 69, 206, 222, 301, 308, 312, 317, 463, 608, 619).

(k)  The aircraft lights are reflected inside the house (T. 226).

14.  From records kept by several of the plaintiffs, the court finds that in the four-month period from April 1965 through July 1965, a period of 122 days, there were approximately 800 landings and takeoffs of jet aircraft over or near the properties of the plaintiffs. Some days there were no flights and the highest number recorded in a single day was 44.

15.  Propeller-driven aircraft and later the prop-jet aircraft have been landing and taking off over or near the plaintiffs' properties since it was used as a military base in 1941. One of the plaintiffs, Katherine Drew, for whose family the former military field was named, has lived in her present home for approximately 32 years. She stated that the noise of the military bombers during World War II was about the same as the present jet aircraft (T. 306). Another plaintiff, Mr. Robert Sullivan, moved in in May of 1947. He testified that the prop planes used to spill oil on the house and clothes which were on the clothes line (T. 205, 208). He described the condition as "awful bad" (T. 209). He was unable to state whether the propeller planes flew lower or higher than jet planes, his comment being "all of them were real low" (T. 210). Another plaintiff, Armando Zorrilla, stated that he had been bothered by the flights of aircraft over or near his house for approximately eight years (T. 82). Isabel Zorrilla, one of the plaintiffs who kept a record of the aircraft flights for the four-month period, was unable to tell inside of her house whether the aircraft which she was recording was a propeller aircraft or a jet aircraft and on each occasion that a recording was made, she would have to go outside to make a visual observation to determine whether the aircraft was jet or propeller driven. (T. 222, 225).

16.  The flight of aircraft over or near the plaintiffs' properties has caused a mixed influence on the market (T. 664), and, generally, the value of plaintiffs' properties has been adversely affected and the market for the properties has been slow (T. 686). While several of the plaintiffs have made some effort to sell their property without success, a majority of the plaintiffs have not tried and did not wish to sell (T. 15, 35, 52, 75, 202, 211, 303, 314, 326, 466, 610, 615). Although loans have been made in the subject area by local federal savings and loan associations, the Federal Housing Administration and the Veterans Administration have not guaranteed loans (T. 702).

17.  Propeller planes never flew less than 500 feet over plaintiffs' properties (T. 32, 73). There was no actual, continuous, uninter-

rupted use of the 250-500 feet airspace here involved for a period of twenty years.

18. Plaintiffs' properties are in an area that has been recommended for non-residential development and exclusion of places of public assembly based upon the recommendations of the Federal Aviation Agency. Their properties are also in an aircraft approach zone (plaintiffs' exhibit no. 4). Plaintiffs' properties are in an area in which minimum height restrictions are in effect (T. 118).

19. The invasion of the jet aircraft directly over plaintiffs' properties and the noises and vibrations created thereby have subtracted from the plaintiffs' full enjoyment and normal use of their properties.

20. None of the plaintiffs have actually physically moved out of their properties.

21. The Douglas DC-8 is the jet aircraft using Tampa International Airport with the longest wing span of 142 feet, 5 inches (joint exhibit 1-C). The aircraft generally fly in a pattern which on landing from east to west would carry them on a line with "approach zone" as the same is designated on joint exhibit 1.

22. The flight operations over the properties involved are necessary and unavoidable in the efficient and proper operation of the Tampa International Airport by the defendant and are performed in a skillful maner.

23. Most of the plaintiffs obtained and moved onto their property for ethnic and other reasons. They like the neighborhood and do not wish to leave.

24. This action was filed in the court on March 6, 1964.

25. It is undisputed that Tampa International Airport is currently one of the main hubs in the national and international air carrier network. It is not only important as a part of that network but also has a great effect on the economic influences in the Tampa Bay area. It has already spent many millions of dollars in its present expanded form and contemplates many more millions in its new terminal complex. The economic benefit of a major airport of this nature on the local community which it serves is impossible of actual measurement and this court acknowledges the airport's convenience and economic improvements to the community.

There is no evidence that the aviation authority in operating the airport has adopted and enforced rules and regulations governing aircraft users of the airport in such a manner that interference with neighboring property would be reasonably eliminated.

*Discussion*

The elusive issues of this controversy, in their broadest sense, pertain to the rights of owners of properties adjacent to public airports vis-a-vis the interest of the public in the navigable airspace over and near the surface of said properties. More specifically, this court must decide whether the facts adduced prove a noise-nuisance which amounts to a taking within the meaning of the Florida constitution. The same mixed question of fact and law in every such case in this state must be resolved by the appropriate court since our constitution places the burden of decision relative to the taking, in a case of this nature, upon the judge and not the jury, although determination of the extent of the taking and the amount of damages therefor is a duty of the latter, as is hereinafter more specifically explained.

Before this century of dynamic change in all aspects of life, the common law notion that a landowner's proprietary interest in his land extended to the periphery of the universe and to the center of the earth had been widely embraced by the courts of America. Only spotty support for a strict application of the legally whimsical doctrine was elicited, however, to circumstances involving flights of aircraft. With the development of the advanced airplane and modern air travel, this ancient legal device, known as the ad coelum theory, which due to lack of foresight had become thoughtlessly embedded in the common law, became the subject of broadside legislative and judicial attacks of devastating qualification and modification to accommodate the competing needs of air travel, culminating in 1956 in a landmark U. S. Supreme Court opinion. Mr. Justice Douglas, in United States v. Causby, 328 U. S. 256, trenchantly wrote that the doctrine had no place in the modern world. The justice stated that —

"The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operation to countless suits. Common sense revolts at the idea. To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest and transfer into private ownership that to which the public has an interest".

Legislation designed to adapt common law principles to the needs of air travel, including a Uniform State Law for Aeronautics, the Air Commerce Act, the Civil Aeronautics Act and the Restatement of Torts, was formulated and passed in an attempt to resolve the contesting interests between landowners and public bodies engaged in air transportation, the enactments rejecting the notion that landowners owned all of the superjacent airspace in favor of one that they owned only some of it.

During this period of legislative and judicial fluxion, military and civil aviation advanced, and is still advancing, in a strong current of almost cataclysmic expansion and development. The epoch of fast jet-propelled aircraft, which produce greater noise and vibration than their piston-engined antecedents, has enhanced the accompanying disturbances to landowners adjacent to airports.

The development of the more powerful jet engines has also resulted in production of larger and heavier craft which require longer and shallower takeoff and landing paths. (H. R. No. 36, 88th Congress, 1st Sess. 17-18/1963). These developments have, of course, intensified the problems of noise and vibration, not only for property owners located directly beneath the flight paths but also for other owners so near by as to suffer increasing and real harassment from airplane disturbances which rob them of sleep, impair communication, destroy the peace and serenity of surface activity and reflection, sometimes with bad effect healthwise.

Adversely affected landowners initially sought relief through suits based upon theories of trespass and nuisance, but successful results by way of injunction or compensatory relief based on these theories have been increasingly infrequent and landowners have, perforce, gone in other legal directions to raise justiciable issues in seeking redress.

The courts, therefore, have been called upon in manifold cases to adjudicate these issues involving the relative interests of landowners, airport operators and aviators, and at least five different theories of airspace rights have been advanced and considered by judges and juries.

As previously stated, the ad coelum theory and ownership to the heavens was advanced, but unanimously rejected by the courts. A few courts did adopt a limited or qualified ad coelum theory embraced in the Uniform Law for Aeronautics and the Restatement of Torts (which was withdrawn in 1943). Other courts held fast to minimum flight altitude legislation as standards for adjudicating claims of property owners but were loath to fix liability for flights beneath the altitude limits in the absence of actual physical damage. Some tribunals adopted a doctrine of airspace ownership to the height of "possible effective possession", and finally some courts rejected all claims to airspace beyond that actually occupied by the landowner, granting relief only when he could prove that his property had suffered actual physical damage or that frequent, low, overflights had substantially interfered with the direct use and enjoyment of his land. (See Col. Law Rev., vol. 65, page 1430.)

Then the cited Causby decision, wherein continued low flights of military aircraft constituted a taking, entitling the plaintiff to damages both for the tangible loss of 150 chickens and diminished use and enjoyment of the property, and the decision in Griggs v. Alleghany County, 369 U. S. 84 (1962), clearly established that easements can be taken by repeated low level flights over private property against the federal government, as in the Causby case, and against municipal corporations, as in the Griggs case. When such easements are taken, compensation must be paid to the owners of the lands thus burdened with the taking. This much has been well settled. (Thornburg v. Port of Portland, 376 P. 2d 100 (Oregon 1962); City of Jacksonville v. Schuman, 167 So. 2d 95 (Fla. App. 1964); and cases cited therein.)

While the Causby decision clearly established the right to compensation by inverse condemnation and has governed the theory of most suits since, it has fostered much confusion as to the elements necessary to establish a taking. Its suggestion that the property interest taken is equivalent to an easement of passage over the surface and the reference by the court to physical invasion of superjacent airspace has also created a doubt as to whether a claim of taking may be based solely on flights over neighboring property, even though the disturbances caused by the guilty aircraft may be just as severe and upsetting as those resulting from direct overflights. If these views are correct, any frequent flying through low airspace would amount to a taking. Moreover, even when the requirements of interference with use and enjoyment have been met, which the courts have constantly insisted upon, many perplexing questions have arisen as to the nature and extent or magnitude of the interference necessary to establish a taking. The courts have continuously, and are still, groping for a precise standard in this regard but thus far none is in sight. The conflicting results of the decisions of the courts in searching for the standard, and the irrationality of discrimination based upon the place or position in the sky of the aircraft causing disturbance, reflect the complex and obscure nature of constitutional protection of private property. The numerous attempts to arrive at general principles of law which might apply to a wide range of factual situations have been the cause of the production of the multiplicity of standards, some of which are tenuous and nebulous indeed.

Inverse eminent domain taking in these cases as a basis for relief is a judicial contrivance which appears to be justifed only upon the court's duty to arrive at justice. This is regrettable because the theorem involves the application of what was intended to be a constitutional restraint on governmental power as a practical everyday legal procedure for awarding compensation to landowners

adversely affected by aircraft noise and vibration and nuisance and injury. Its use has been imperative because of the failure of federal and state governments to move into this rapidly developing area and provide adequate mechanisms and standards for accommodating the recognized interests of both landowners and the operators of public air transportation facilities.

Under federal and some state holdings, a nuisance consisting of noise made by the government or by an entity operating pursuant to governmental authority does not constitute a taking even when it causes decline in value of real property and an injunction will not lie to restrain noisy operation of governmentally operated airports. Ordinarily, despite the noise level, as between a landowner whose property is directly under the flight path and his neighbor whose land lies to the side of it, different impacts exist. Both have been damaged, equally perhaps, but the property of only one has been taken under a strict interpretation of the federal and about fifty per cent of our state constitutions. Once a taking has been established, under the strict interpretation theory, the landowner may recover for consequential damages to the remainder of his property, including noise and vibration damage, from aircraft using the path. But, the neighboring landowner may not recover for the same noise and vibration in the absence of actual negligence.

The rationale of these decisions was not controlling in the Thornburg case, supra, and in Martin v. Port of Seattle, 391 P. 2d 540 (Wash. 1964), because a unanimous court in the latter and a four-to-three majority in the former held that noise and vibration damage caused by aircraft not negligently operated and not flying directly over plaintiff's property was nevertheless compensable.

In the Thornburg case (1962), the court said — "a continuing and substantial interference with the use and enjoyment of property" amounts to a taking within the meaning of the Oregon constitution and that the issue of whether it is substantial enough to permit recovery was for the jury to determine. This holding would appear to support the legal idea that a mere nuisance may be considered a taking under a provision similar to that in our Florida constitution. An even broader interpretation was indulged in the later Martin case, where it was held that the noise interference did not have to be substantial and indicated that a constitutional taking could be accomplished even below the noise-nuisance level by stating that recovery should be granted when the land of private landowner "is diminished in value for public benefit."

Earlier decisions enunciating constitutional concepts to the contrary were ignored by the Washington and Oregon courts in reaching the conclusions arrived at in Martin and Thornburg.

While the precise appellate intent changing its constitutional concepts is not clear in the two cases, it is obvious that they recognize a state's power to interpret its own constitutional taking provisions. They did in fact change their constitutional standards even if they did not intend to formulate separate rules for aircraft operating from public airports.

And, howsoever the court might have been differently persuaded before the decision of our First District Court of Appeal in City of Jacksonville v. Schuman, 167 So. 2d 95, the polestar opinion in that case settled the issues — and is binding upon this court insofar as interpretation of Florida's constitutional taking provisions are concerned.

A case of first impression in Florida upholding inverse condemnation as a triable cause of action where noise and vibration from aircraft are involved, the Schuman decision clearly recognized that the substantial economic value of property lies in the rights of its use and enjoyment. The court, in the broadest interpretation of constitutional taking provisions yet made by the courts, not only approved and adopted the spirit and language of the Martin decision rejecting the substantial interference doctrine, but gave sanction to the strong language of State Road Department v. Tharp, 1 So. 2d 868 (1941), relative to the protection by our constitution of the rights of private property owners. In this regard it pronounced —

> "To be a property owner and a taxpayer is one of the surest incentives to a dependable citizenship. It gives the citizen a stake in his government second to no other influence. It is one of the first duties of constitutional government to protect, and where the sovereign has a right to condemn for public use, it will not be permitted to appropriate except by orderly processes. The current of the law on this point will not lead to any other conclusion."

The case appears to stand for the proposition that a Florida property owner is free from constitutionally forbidden taking of the peaceful enjoyment and use of the property comprising his home by an airport operator without just compensation, the taking being established if the interference with such use and enjoyment is sufficiently peculiar and of sufficient magnitude to cause the court to conclude that fairness and justice, as between the public body and the individual citizen, require that the burden imposed be borne, at least partially, by the public for whose benefit the airport exists and not by the individual alone.

The Schuman case also resolved the question of overflight taking by following and strengthening the Thornburg hypothesis that

interference by the noise vector need not come from directly overhead and the question of proper party defendant by clearly espousing the Griggs holding, which followed the much earlier Washington Supreme Court decision of Ackerman v. City of Seattle, 348 P. 2d 664, that the operator, owner and lessor of the airport was the party taking the easement in a constitutional sense. The court, in getting to the heart of the concept, stated that the operator having power of eminent domain had used the power to obtain substantial curtilage for the establishment of the airport but had not acquired enough when it failed to acquire over plaintiff's property approach easements which were necessary for the proper operation of the airport.

This court's interpretation of the Schuman decision is conclusively determined by the advanced pronouncement of the Supreme Court of Florida in Brooks v. Patterson, 31 So. 2d 472, which was, incidentally, recognized as highly determinative of the airlines' non-liability for nuisance in the operation of their aircraft at a municipally-owned airport at Jacksonville in Corbett v. Eastern Air Lines, 166 So. 2d 196.

Our highest appellate court held, in the Brooks case in 1947, that the city of St. Petersburg, as owner and operator of an airport, was chargeable with protecting its citizens from planes flying too low over properties of citizens of the city. The court cannot escape the opinion that the defendant authority herein is in the same position as the city of St. Petersburg was in Brooks. The court therein, on page 476, held, among other things, the following —

"The city owes to every citizen the utmost care, caution and precaution in the operation of its utilities and in carrying on each of its municipal functions. Every safeguard possible should be thrown around the individual in the protection of his property and of his person . . ."

still quoting —

(page 477) "Under this decree we must assume that the defendants will adopt rules and regulations governing the users of the airport which, among other things, will reasonably prohibit planes being flown over the property of plaintiffs at a height less than will be required to prevent the vibration caused by the operation of the plane, doing damage to the house or other property of either of the plaintiffs, and will also prohibit planes being flown over the property of plaintiffs at a height less than that which will reasonably eliminate shock and fright being reasonably experienced by persons occupying plaintiffs' property."

This decision dictates, as a matter of public policy in Florida, that an operator of an airport must protect citizens living under the flight of the airplanes. If the defendant aviation authority in this case is not in a position to change the height of the flight of planes over the properties of the plaintiffs, and no rules and regulations in this regard have been adopted, it is then obvious that the flight of the low-flying planes constitutes a taking of some portion of the plaintiffs' properties — which the defendant aviation authority should be obligated to purchase.

Airport attempts to provide antinoise flight rules which conflict with federal traffic schemes and federal safety regulations have been held to be invalid in Alleghany Airlines, Inc. v. Village of Cedarhurst, 238 Fed. 2d 812, for the reason that the federal authority has preempted the field in this regard. This holding and others clearly show that Congress has manifested an intent to preempt the field of air traffic regulations which precludes injunctive relief and tort liability by state courts where low flights are made in compliance with the federal regulations.

The precise scope of the preemption principle remains uncertain, but the establishment of permissible maximum noise levels presumably measured in decibels as would be possible under the Brooks decision, would appear not to necessarily conflict with federally established patterns of flight and might elude the proscription of preemption entirely, particularly if technological research in noise suppression of jet planes yields satisfactory results.

At any rate, the thesis developed in Brooks v. Paterson is not only not incompatible with the doctrine of inverse condemnation but indeed appears to make that doctrine imperative in view of the decision in the Schuman case. Reasoning by analogy from the Brooks case, it appears that in the absence of the issuance and enforcement of regulations governing flight approach altitudes meeting the tests laid down by our Supreme Court, these tests must be applied in each case to determine whether the disturbance mentioned in the Brooks case are present, and upon a finding that they are, by aircraft using the public airport, a constitutional taking, for which the plaintiffs affected should be compensated, is present.

The big question in this case, as in all similar cases, of course, concerns where the line is to be drawn in the application of the tests to determine whether the disturbances amount to a taking. If property owners on Ivy Street may recover, what about those on Abdella, Cordelia, Dewey or Aileen, or what about those one or two streets to the east, as far as the noise vibrations and other disturbances may be felt? It may be said that the injury could be the same to all and differs only in degree. And, if by judicial

interpretation, the constitutional provisions relative to eminent domain takings be extended to all possibilities involving the proper operation of modern heavy jet aircraft, which are necessarily vibrant and noisy, we might be swept into a veritable sea of legal confusion without chart or sextant.

Ours is a noisy world. As this decision is being written, the court has been able to separate nine distinct loud but common noises through closed windows in the courthouse — the rapid and jarring blasts of a large jackhammer ripping into the concrete and asphalt on the street below; the sharp staccato reports of a riveting machine being used on construction in the next block; the disconcerting moan from the siren of a passing ambulance; the subdued thunder of a jet plane overhead; the coarse rumble of a large diesel engine on a trailer-truck and the acceleration of engines of automobiles passing by; the whir and hiss of air-conditioning equipment; the urgent ringing of a desk telephone; and the rattle and hum of the secretary's typewriter. The addition of new noises to the crescendo of our times is upsetting. The sonic boom of low-flying supersonic aircraft can break doors and windows. Experiments have shown that noises will kill small animals and, presumably, human beings. Dr. Harris Pomerantz testified that noise levels have increased about one decibel per year in the general environment in the last 25 years and that a similar increase in the next few years would be intolerable.

The story of noises in the shaping of the law, however, up to the time of the Thornburg and Martin holdings, had not been one of the development of new standards to fit new disturbances but rather the courts had attempted to apply established noise principles of law to solve long recognized problems arising in different forms from different noise vectors. That such is not true of modern aircraft noises and disturbances has been demonstrated by the courts, as hereinbefore related.

All individuals, of course, must suffer some inconvenience and indulge a certain amount of disturbance in the form, not only of noise but also, of smoke, odors and other necessary results of industrial development and overall progress in benefiting the public in a swiftly advancing civilization. The Florida authorities cited make it clear that the noise line must be drawn, however, and where it is to be drawn, under the present status of the law, is much more difficult to answer than who should do the drawing, because our appellate courts in the Brooks and Schuman decisions have placed this burden on the courts in the absence of effective legislative function in the field of public air transportation and the furnishing of fair and equitable mechanisms by the sovereigns, both state and federal, to accommodate brand new and rapidly developing economic and social facts of life connected with air travel.

It is the law's theory that conduct of airport operators along these lines is either lawful or unlawful. As the difference has no graduations permitting an act to be a little bit unlawful or quite a lot lawful when it is applied to different types of conduct which appear to be very similar to each other, it may appear to be arbitrary.

The courts have drawn the line before, though, and while human judgment is an inevitable element in the application of any law, and sometimes results in uneven results, each court in Florida, for the time being at least, apparently must find the facts in each particular case submitted to it and arrive at its best conclusion in the light of its understanding of the law as enunciated in the controlling cases herein cited.

This has been a difficult decision for the court for obvious reasons, but also because the decision herein expressed does not represent what the court thinks the law ought to be. The unusually prolonged recitations in this decree have been prompted by the court's desire to set forth with particularity the reasoning on which its ruling is bottomed, in the hope of clarifying some of the issues involved and assisting appellate review of the case. The court is aware that there are many clear and penetrating opinions from other jurisdiction which, under similar facts, have reached conclusions other than those arrived at here. Two of these are so recent they have not yet been officially reported, and one is from a fellow circuit court of Florida, both denying takings under similar factual complexes.

By way of additional observation, insofar as the court's personal opinion is concerned, the real and formidable difficulties, which have arisen in the theoretical and practical aspects of the law from the impact of the comprehensive scheme of federal regulation of aviation, the federal preemption of the navigable airspace, federal safety flight patterns and rate schedules, have precluded the development of effective and just remedies in connection with the subject matter of this case, insofar as responsibility for easement taking is concerned.

The courts have decreed, as cases cited herein also demonstrate, that the primary responsibility for the establishment and location of a public airport, including the condemnation of land and air easements and the physical location of runways and other facilities, generally rests with the owners and operators of the public airport. This creates a strong incentive for such authorities to plan with care, but it would also appear that, in fairly distributing the burden over all of those who will benefit by operation of the airport, the federal authority which regulates approach path flights and issues

and enforces other flight safety regulations should bear the costs of either satisfying inverse condemnation judgments or acquiring landing approach easements necessary for compliance with the federal rules in those cases where compliance will result in a legal taking.

Following the rationale of the Schuman case, however, in the light of direction in the Brooks case, which this court in its judicial duty conceives it is bound to do, and in view of the facts established in this case, the court arrives at the following —

## Conclusions of law

1. Plaintiffs as property owners have title to and certain rights in the airspace above their land. Reaver v. Martin Theatres of Florida, 52 So. 2d 682. Air easements may be the express subject of condemnation proceedings with the remainder of the title of the land to remain in the landowner. State v. Jacksonville Expressway Authority, 139 So. 2d 135. The defendant aviation authority is a public agency which has been granted the power of condemnation and has the authority to condemn air easements. F.S., 1947, chapter 24579, vol. II, part 1, page 1434, et seq.

2. Permanent air easements can be appropriated or "taken" where there are frequent flights of jet aircraft 250 - 500 feet directly over residential properties when such flights appear destined to continue indefinitely, and they materially reduce the ordinary use and enjoyment of said properties by their owners. Under this principle, all of the plaintiffs, with the exception of the Castillos, are clearly entitled to recover. (City of Jacksonville v. Schuman, 167 So. 2d 95; United States v. Causby, 328 U.S. 266, 66 S. Ct. 1068; Griggs v. Alleghany County, 82 S. Ct. 531, 369 U.S. 84; Thornburg v. Port of Portland, 376 P. 2d 100.)

3. Permanent air or avigational easements can be appropriated by repeated low-level flights of jet aircraft where the aircraft do not fly directly over the property of the landowner, provided such flights cause a substantial interference with the use and enjoyment of the landowner's property and the interference may be caused by noise vibration and other disturbances from low flying aircraft which may constitute a "noise-nuisance" and can amount to a taking. (Schuman, Thornburg, and Brooks cases, supra.)

4. The defendant aviation authority is the appropriate agency that has committed the taking of an easement over plaintiffs' properties and is the proper party defendant. (Schuman, Griggs, Thornburg, and Martin cases, supra, and Corbett v. Eastern Air Lines, 166 So. 2d 196.)

5. To permit the low level of jet flights over plaintiffs' properties to persist without compensation would be in violation of article XVI, section 29 of the Florida constitution, which provides that — "No private property, nor right-of-way, shall be appropriated . . . until full compensation . . . shall be made". The Florida Supreme Court has held — "All doubt should be resolved in favor of the constitutional interdiction against the taking of private property without compensation." (Alford v. Finch, 155 So. 2d 790, 793).

6. The avigational easement was taken by the defendant authority gradually over a period of time beginning in May of 1960 and the time of taking is fixed as of January 1, 1963. Since the time of taking has been less than twenty years and plaintiffs were not guilty of delay, the defendant's affirmative defenses of statute of limitations, prescription, or laches, cannot be sustained because of the decision in Florida Power Corp. v. McNeely, 125 So. 2d 311.

## Final decree

The foregoing findings of fact, discussion and conclusions of law having been duly considered, it is hereby considered, ordered, adjudged and decreed that the defendant Hillsborough County Aviation Authority is hereby directed to file in the circuit court of Hillsborough County within sixty days of his order, condemnation proceedings against the plaintiffs, condemning an avigational easement directly and diagonally above, across and over the properties of the plaintiffs beyond the altitude of 250 feet, pursuant to chapters 73 and 74 of the Florida Statutes. Costs are taxed against the defendant.