Willie D. ROBINSON and Olivia Robinson *v.* CITY OF ASHDOWN

89-235                                          783 S.W.2d 53

Supreme Court of Arkansas
Opinion delivered January 29, 1990

*Walker, Roaf, Campbell, Ivory & Dunklin*, by: *Sheila F. Campbell*, for appellants.

*Jay P. Metzger*, for appellee.

DAVID NEWBERN, Justice. This is an inverse condemnation case. The appellants, Willie D. and Olivia Robinson, presented evidence that their home had, over a nine-year period, and despite their continued pleas to city officials and the city council for relief, been flooded intermittently with effluent from the sewer system constructed and operated by the appellee City of Ashdown. They sought compensation for the taking of their property which their evidence showed had been substantially reduced in value by the flooding. The court held that the Robinsons had shown only negligence on the part of the city and directed a verdict against them on the basis of the city's immunity from actions in tort. *See* Ark. Code Ann. § 21-9-301 (1987). The question presented to us is whether instances of negligence, with respect to which the city

has immunity from suit, may, if sustained a long time, amount to inverse condemnation. We hold that in such circumstances inverse condemnation occurs, and the judgment is reversed and remanded.

The Robinsons moved into their newly built house in 1974 or 1975. In the winter of 1978-79 they began to have sewer problems. Raw effluent came through their toilets and shower floor opening. At first Mr. Robinson thought there was a problem with his service line connecting his house to the sewer line under the street in front of the house. Plumbers investigated and found no problem with the Robinsons' service line. It was clear that the sewage was backing up from a source outside the Robinsons' house.

The Robinsons presented the testimony of Ray Burk, an engineer hired by them to study the problem. Burk determined that the elevations of the openings in the Robinson home were only slightly higher than that of the "wet well" at a lift station into which the city's sewage was supposed to flow before being pumped to a higher elevation for processing. Lift pumps at the wet well were designed to pump the raw sewage to a higher elevation for processing and, when operating normally, to keep the well from overflowing. When the well did overflow, the sewage backed up into the lines. There is a manhole near the Robinsons' home through which access is obtained to the city sewer line. Sewage backing up from the lift station flooded the manhole from time to time, and when the manhole filled, the Robinsons' home was next lowest point, and the sewage would come out there. On many occasions, Mr. Robinson went to the lift station to turn on the lift pumps by throwing a breaker switch. Mr. Burk testified that the pumps were apparently adequate to control the problem when they were running.

The problem continued over the years. Mr. Robinson had employees of the city water department inspect his home, and he presented the matter to the city council on more than one occasion without relief. Photographs introduced into evidence showed extensive water damage to the home. Mr. Robinson made an opening in the service line in his yard and dug a hole there in an attempt to take care of the overflow. He testified that the smell was ever-present in his house and yard. His family could not use

the home to entertain friends, and they feared for their physical well-being.

Mrs. Robinson testified that one of their children once came to her and said there were "flowers" growing in the shower in the master bedroom. It was a fungus. Mrs. Robinson testified that the house was constantly smelly and damp and that she and her daughters had had fungal infections resulting from germs in the shower stall.

On cross-examination, Mrs. Robinson stated that the problem had lessened in 1986. While the flooding would no longer wet the carpets, the toilets continued to overflow and the water "might . . . hit the edges." She said the house smells bad now, and she and her family cannot enjoy it at all.

The technical testimony presented by the Robinsons and by the city conflicted. The mayor of Ashdown, Charles Patterson, who is an engineer with considerable experience designing city sewer systems, testified that Mr. Burk was wrong and that the problem could not have originated with the lift station as Burk had explained it. However, Bill Duckett, a foreman in the city water department testified that the lift pumps in the lift station nearest the Robinson home would stop running in periods of heavy rainfall. Restarting them would cause the water level to fall, but it would take 24 hours before the area of the Robinson home would be relieved. Mayor Patterson testified that the lift pumps were replaced after he became mayor in 1987.

*Negligence, nuisance, and inverse condemnation*

In *McLaughlin* v. *City of Hope*, 107 Ark. 442, 155 S.W. 910 (1913), we clearly recognized a cause of action for inverse condemnation, although we did not describe it in those words. A miller leased land through which a stream passed. The city, which was an upper riparian landowner, began to discharge sewage into the stream. That made the water unsuitable for producing steam to run the mill. The miller brought an action for damages. The city defended on the basis of its sovereign immunity. The trial court sustained a demurrer to the complaint. We reversed and held that, although the complaint could have been worded more artfully, it was not a claim for negligence or wrongdoing on the part of the city but was a claim for compensation due pursuant to

Ark. Const. art. 2, § 22, for the taking of property. *See also Jones v. Sewer Imp. Dist. No. 3 of Rogers*, 119 Ark. 166, 177 S.W. 888 (1915), where we noted with apparent approval that the plaintiff in a nuisance abatement proceeding had, in a separate proceeding in circuit court, been allowed to recover for a taking of his property by a sewer improvement district due to the city's negligent operation of a septic tank.

In part III of their complaint, the Robinsons clearly stated a claim for "a taking of the plaintiff's property" which "condemned and destroyed all reasonable value of the property" requiring that the plaintiffs be "compensated in full for their loss." The question becomes whether a "taking" may occur as the result of the city's negligent operation of its sewer plant. The trial court's ruling suggested that by proving the city's negligence the Robinsons killed their inverse condemnation or "taking" claim. We think not.

As originally conceived and developed, the concept of inverse condemnation was a remedy for physical taking of private property without following eminent domain procedures. "Fault" has nothing to do with eminent domain, and it is not bare trespass or negligence which results in inverse condemnation but something which amounts to a de facto or common law "taking." J. Sackman & P. Rohan, *Nichols on Eminent Domain*, § 8.1[4] (Rev. 3d ed. 1985, Supp. 1987). Inverse condemnation is thus a cause of action against a governmental defendant to recover the value of property which has been taken in fact by a governmental entity although not through eminent domain procedures.

We are aware that it is commonly stated that neither negligent acts committed during routine operation of a public improvement nor other negligence having no relationship to the function of the public work as it was conceived gives rise to a claim for inverse condemnation. *See, e.g., Yee* v. *City of Sausalito*, 190 Cal. Rptr. 595, 141 Cal. App. 3d 921 (App. 1983). Although injury to property through negligence or trespass does not, without more, qualify as a taking, it has been held that a continuing trespass or nuisance can ripen into inverse condemnation. *City of Jacksonville* v. *Schumann*, 167 So.2d 95 (Fla. App. 1964).

Courts have used both nuisance and trespass theories to

overcome the general rule that negligence does not result in inverse condemnation. The author of Annotation, *Taking For Public Purposes*, 2 *A.L.R.2d* 677 (1948), discusses the wide variety of rationales among the cases from various states and even within the decisions of the courts of single states in which it has been held that negligence based acts by governmental entities constitute inverse condemnation. It is noted that actions brought in an attempt to avoid municipal tort immunity

> have occasionally been successful in some jurisdictions, at least in such particular and specific types of situations as those in which public projects were planned, constructed, repaired or maintained and operated in a negligent manner, or those in which public activities were planned and carried on negligently in such a manner that a nuisance condition resulted to the injury of private property. [2 *A.L.R.2d at* 680-681]

> . . . .

> While it is difficult to reconcile the broad language contained in the individual opinions, even within the same jurisdiction, it may be remarked that the cases have turned upon such factors (1) as the form of the constitutional provision involved; (2) whether, in the jurisdiction, recovery is allowed at all in any type of case under the "eminent domain" theory; (3) the mode in which the asserted cause of action was presented to the court; (4) whether the project itself negligently planned or constructed was an activity for the original establishment of which the right of eminent domain could have been exercised; (5) and, similarly, whether damages which resulted were a necessary consequence or result of the work undertaken. [2 *A.L.R.2d* at 681]

The city argues that the cases in which we have permitted recovery against a municipality or governmental entity for a taking of property in circumstances similar to those here have been ones in which it was shown that "the governmental entity purposely engaged in an endeavor that caused damage to various landowners." That presents no distinction in this case because when one knows that an invasion of another's interest in

the use and enjoyment of land is substantially certain to result from one's conduct, the invasion is intentional. *See Rest. Torts 2d*, § 825(b), comment (d), discussing conduct constituting nuisance. Here the invasion continued long after the city was put on notice of it.

The city relies on *City of Fort Smith* v. *Anderson*, 241 Ark. 824, 410 S.W.2d 597 (1967), in which we reversed a jury award resulting from a single sewage overflow into the landowners' home. It was a onetime occurrence, and the problem with the city system was immediately corrected, thus it presents no authority in support of the city's position here.

■ The city also notes that a taking pursuant to the eminent domain power may not occur unless there has been public benefit. The benefit to the public in this case has been its use of the Robinsons' home as an overflow dump for sewage. While it might have been less expensive for the city to have seen to it that the overflow did not occur by installing pumps that worked automatically or by hiring more employees to see that they were working when they should have been, it is our view that by failing to remedy the problem the city effectively chose to purchase the Robinsons' property to the extent the value of that property was diminished by its actions. The public benefitted by not having to spend the money it would have taken to prevent the sewage overflow.

■ We agree with the suggestion of the author of the *A.L.R.2d* annotation quoted above that the courts have not been clear in presenting their rationales in cases where statutes conferring immunity from tort liability upon municipalities have been held inapplicable to facts which amount to negligence or nuisance. We want it to be clear that our holding here is based on Ark. Const. art. 2, § 22, which provides, "The right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated or damaged for public use, without just compensation therefor." When a municipality acts in a manner which substantially diminishes the value of a landowner's land, and its actions are shown to be intentional, it cannot escape its constitutional obligation to compensate for a taking of property on the basis of its immunity from tort action.

Reversed and remanded.

GLAZE, J., concurs.

HICKMAN and TURNER, JJ., dissenting.

OTIS H. TURNER, Justice, dissenting. Irrespective of how the majority may rationalize its reasons for reaching an equitable result, this action is nothing more nor less than a suit against a tort-exempt municipality for damages occasioned by negligence. We made one such foray into this arena in *Parish* v. *Pitts*, 244 Ark. 1239, 429 S.W.2d 45 (1968), an opinion that precipitated the passage in 1969 of Act 165, codified at Ark. Code Ann. § 21-9-301 (1987), which provides:

> It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other political subdivisions of the state shall be immune from liability for damages. No tort action shall lie against any such political subdivision because of the acts of their agents and employees.

This statute is unequivocal in its prohibition against *any* action sounding in negligence, whether based upon trespass or any other tort. Statutes granting immunity from tort liability to subdivisions of the state have been held constitutionally sound by this court. *Thompson* v. *Sanford*, 281 Ark. 365, 663 S.W.2d 932 (1984).

We are today holding that, solely as a result of a municipality's recurring acts of negligent trespass, without a showing of any intent, offended parties may elect to consider their property "taken" by the political subdivision. I do not agree that this holding is within the meaning or the spirit of the Arkansas Constitution, the acts of the General Assembly, or our prior decisions.

The majority cites in support of its rationale the case of *Jones* v. *Sewer Improvement Dist. No. 3. of Rogers*, 119 Ark. 166, 177 S.W. 888 (1915), stating that we there noted with "apparent approval" that the plaintiff had, in a *separate* proceeding, been allowed to recover for the taking of his property by a sewer improvement district due to the negligent operation of a septic tank. The issue of damages, however, was not before this court in *Jones*; rather, we were asked to enjoin a sewer system from

operating in such a manner that created a nuisance on the lands of a farmer. The proper remedy was requested, and, in reversing the lower court, we ordered an abatement of the nuisance.

The only other Arkansas decision cited as authority by the majority is *McLaughlin* v. *City of Hope*, 107 Ark. 442, 155 S.W. 910 (1913). There, the city intentionally dumped raw sewage into a stream to the injury of a riparian land owner who used water from the stream in his business. In *McLaughlin*, we accepted the proposition that when a city or town is authorized to collect the sewage of its inhabitants and discharges the waste into a private stream to the damage of the lower riparian owners, this conduct amounts to an exercise of the power of eminent domain for which compensation should be paid.

The major distinction between *McLaughlin* and the present case relates to scienter. In *McLaughlin*, there was no negligence involved — the waste was discharged into the stream by the city with knowledge, and the act was intentional. Here, recurring acts of negligence were shown in the city's failure to adequately maintain a lift pump to transport sewage away from the appellants' property. The appellants' proper remedy would have been an action to seek abatement of the nuisance instead of one for damages.

In *Jones* v. *Sewer Improvement Dist. No. 3 of Rogers*, we said:

> [T]his court has uniformly held that neither municipal corporations nor local improvement districts nor their officers may be sued at law for tort; but it does not follow that in a proper case they may not be enjoined from creating a nuisance or be required to abate one already created by them. Indeed, this affords ground for equitable relief in actions like this.

A tort is a tort, even if it is called "inverse condemnation," and an action in tort cannot be brought against a municipality.

I respectfully dissent.

HICKMAN, J., joins this dissent.