UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Appellee,

v.

CITY OF GREEN FOREST, ARKANSAS, Appellee,

Lewis Stephen Work, et al., Appellants/Intervenors.

Lewis Stephen WORK, et al., Appellants/Cross–Appellees

v.

TYSON FOODS, INC., and City of Green Forest, Arkansas, et al., Appellees/Cross–Appellants.

Nos. 89–1661–WA, 89–2549–WA, 89–2636–WA, 90–1011–WA and 90–1041–WA.

United States Court of Appeals, Eighth Circuit.

Argued Oct. 10, 1990.

Decided Dec. 18, 1990.

Rehearing and Rehearing En Banc Denied Feb. 14, 1991.

James Bruce McMath, Little Rock, Ark., for appellants/intervenors.

William B. Lazarus, Washington, D.C., for U.S.

Constance G. Clark, Fayetteville, Ark., for Green Forest.

M. Samuel Jones, III, Little Rock, Ark., for Tyson Foods.

Before LAY, Chief Judge, BRIGHT, and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Lewis Stephen Work, et al. (the citizens or Work) appeal from two orders entered December 3, 1987 and March 24, 1989 in the Western District of Arkansas, Oren Harris, *Senior District Judge.* 720 F.Supp. 132. The first denied intervention in a government environmental enforcement action or consolidation of that action with an earlier citizens' action. The second denied another motion for intervention in the Environmental Protection Agency (EPA) action. The citizens appeal also from final judgments entered June 19, 1989 and August 24, 1989 after trial of the citizens' action. Appellee/cross-appellant Tyson Foods, Inc. (Tyson) appeals from the final judgments. Tyson also appeals, and the citizens cross-appeal, from the denial of Tyson's motion for reconsideration filed November 28, 1989. All appeals have been consolidated.

Work commenced the citizens' action against Tyson and the City of Green Forest (the City or Green Forest) on March 3, 1987, asserting claims pursuant to both the Clean Water Act (the Act or CWA), 33 U.S.C. §§ 1250–1387 (1988), and common law. On September 28, 1987, the EPA commenced an action against Green Forest and the State of Arkansas pursuant to the CWA. The government enforcement action resulted in a consent decree. The citizens' action proceeded to trial, resulting in a verdict against Tyson under the CWA; against Tyson and for the citizens on the common law claims; and for Green Forest on the citizens' remaining claims. The court previously had granted partial summary judgment for the City, dismissing the CWA claims against it. The court assessed penalties against Tyson pursuant to the CWA, payable to the United States Treasury.

On appeal, Work sets forth a laundry list of claimed errors by the district court: (1) in denying their motion to intervene and/or denying their motion to consolidate; (2) in dismissing their claims against Green Forest under the CWA; (3) in calculating the penalties assessed against Tyson under the CWA; (4) in various evidentiary and instruction-related matters; and (5) in dismissing medical claims of ten employees, directing a verdict against Patricia Hudson,

---

* Of the Second Circuit, sitting by designation.

and directing a verdict to deny an award of punitive damages.

On cross-appeal, Tyson also claims that the district court erred in various other respects, including: (1) in its instruction to the jury on discharger liability; (2) in failing to grant Tyson's motion for a directed verdict; and (3) in failing to grant Tyson's motion to dismiss.

For the reasons set forth below, we reverse the second order of the district court denying intervention in the government enforcement action and remand for the limited purpose of assessing attorneys' fees; we affirm the final judgment entered in the citizens' action with respect to the CWA claims; and we affirm in part and reverse in part with respect to the common law claims.

## I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal. We also summarize briefly the statutory background of the CWA.

### (A)

The CWA, enacted in 1972, creates a comprehensive program "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As part of that program, § 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits all discharges of pollutants into navigable waters except those made in compliance with other sections of the Act, including § 402, 33 U.S.C. § 1342, which establishes the National Pollution Discharge Elimination System (NPDES).

Section 402(a) provides that the EPA shall issue NPDES permits authorizing effluent discharges in strict compliance with conditions specified in the permit. 33 U.S.C. § 1342(a). Section 402(b) allows each state to develop and administer its own permit program, provided that the program meets federal requirements. 33 U.S.C. § 1342(b). And Section 402(c) provides that the EPA shall suspend issuance of federal permits upon determining that a

state has adequate authority to implement and enforce the permitting program within the state. 33 U.S.C. § 1342(c).

The Act directed the Administrator of the EPA to promulgate regulations setting limits on the pollution that can be discharged, delineated by three general types of "point sources," *id.* at § 1362(14): sources that discharge pollutants directly into navigable waters (direct dischargers); publicly owned treatment works (POTWs), which engage in the treatment of industrial sewage or industrial wastewater, *id.* at § 1292(2); and sources that discharge their pollutants not into navigable waters but into the POTWs (indirect dischargers). *National Ass'n of Metal Finishers v. EPA (NAMF)*, 719 F.2d 624, 633 (3d Cir.1983) (discussing statutory framework of the CWA), *rev'd on other grounds sub nom. Chemical Mfrs. Ass'n v. N.R.D.C., Inc.*, 470 U.S. 116 (1985). "Congress recognized that the pollutants which some indirect dischargers release into POTWs could interfere with the operation of the POTWs, or could pass through the POTWs without adequate treatment." *Id.* Section 307(b)(1) of the Act provides that:

> "The Administrator shall ... publish proposed regulations establishing pretreatment standards for introduction of pollutants into [POTWs] for those pollutants which are determined not to be susceptible for treatment by such treatment works or which would interfere with the operations of such treatment works.... Pretreatment standards under this subsection ... shall be established to prevent the discharge of any pollutant through [POTWs], which pollutant interferes with, passes through or otherwise is incompatible with such works."

33 U.S.C. § 1317(b)(1).

For POTWs, the Administrator was to set effluent limitations based on "secondary treatment," *id.* at §§ 1311(b)(1)(B) and 1314(d)(1). These limitations were to be applied through the NPDES permit for each POTW. *Id.* at § 1342; *NAMF, supra,* 719 F.2d at 633.

The Act authorizes several different enforcement actions if a NPDES permit holder fails to comply with the specified permit conditions. Section 309 authorizes the United States to enforce a federal or state permit through a variety of administrative, civil, and criminal mechanisms. 33 U.S.C. § 1319. A state may take similar action, under appropriate state law, in response to a state-issued permit. *Id.* at § 1342(b)(7). In addition, Section 505(a)(1) of the Act permits private citizens to commence a civil action in certain situations against anyone "who is alleged to be in violation of ... an effluent standard or limitation under this chapter," *id.* at § 1365(a)(1), which includes a federal or state NPDES permit or condition thereof, *id.* at § 1365(f). No such action, however, may be commenced under the following circumstances:

"(A) prior to the sixty days after plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right."

*Id.* at § 1365(b)(1)(b). The CWA specifically provides that statutory and common law rights are not restricted: "Nothing in this section shall restrict any right which any person ... may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief...." *Id.* at § 1365(f).

#### (B)

Green Forest is a small town in the Ozark Mountains of northwest Arkansas. It is located in Carroll County, which has a topography known as "karst". Karst is permeable limestone readily penetrated by surface water. Streams frequently submerge and re-emerge. Streams having an intimate contact with the groundwater system through sinkholes or other means are called "losing streams."

In 1953, the City constructed its POTW at its present location on Dry Creek, a losing stream. Dry Creek flows through the area where Work and the other citizens who commenced the citizens' action live. It is into Dry Creek that the POTW discharges.

In 1959, a poultry processing plant, Franz Foods, was constructed and began discharging a growing waste load into the POTW. Franz Foods was acquired by Tyson in 1968.

In December 1968, the City sought federal funding to construct a new POTW capable of meeting secondary treatment standards. In the grant application process, the EPA approved plans and specifications for the new POTW subject to conditions, including limitations on Tyson discharges. In May 1973, the City requested an NPDES permit, as required by the CWA, to operate its new POTW and discharge into Dry Creek, indicating the POTW should be capable of secondary treatment of waste. The limitations on Tyson discharges however were not enforced. Tyson did not pretreat its waste or produce an effluent meeting the required criteria until 1985.

During the early 1970s, residents east of the City (including several of the citizens involved in this case) sued Tyson's subsidiary, Franz Foods, for maintaining a public nuisance. That action was settled in 1976 after the City's new POTW was completed; Franz Foods agreed not to discharge any waste that would alter Dry Creek's existing condition visually or chemically, or that constituted a violation of any City ordinance, or county, state or federal law.

The loading on the POTW continued to grow, and the POTW failed to meet the standards of its original permit. At the trial of the citizens' action, Tyson's expert witness admitted that, without pretreatment, there would be no way that a waste from a poultry-processing plant like Tyson's could comply with the POTW's design criteria.

The City received periodic warnings from environmental agencies regarding permit

violations and other problems. When the POTW permit expired on May 1, 1977, a new permit was drafted. The Arkansas State Department of Pollution Control & Ecology wrote to the Mayor, stating the need for the City to negotiate a schedule of compliance with Franz Foods. In 1978, on a single-shift operation, Tyson processed approximately 260,000 pounds of chicken per day. In 1979, Tyson processed approximately 310,000 pounds of bird per day. POTW permit violations continued.

In April 1981, the EPA issued a new NPDES permit to the City for its existing facility, requiring an effluent that met higher-quality water standards. In view of the City's inability to meet those standards, an administrative order set interim limits and a timetable for compliance.

In May 1983, a sinkhole opened in Dry Creek. The creek's entire flow ran directly into the ground. At this point, the POTW had a volume in excess of 1,000,000 gallons per day.

At some point in 1984, Tyson's production changed from a cut-up operation to a deboning operation, working with larger birds; this change increased its waste. Tyson then processed approximately 750,000 pounds of chicken per day.

In August 1984, the Arkansas Department of Health advised the City that a number of wells in the immediate vicinity of the sinkhole were being affected; that public water should be made available to the affected residents; and that the City should make efforts to improve the quality of the POTW's effluent.

Tyson completed a pretreatment facility in May 1985. Once it went on-line, the quality of the City's POTW effluent improved dramatically, falling from levels equivalent to diluted domestic sewage to levels well below secondary treatment standards. Tyson, however, continued to be the principal load on the POTW, which in turn continued to violate its now-strict permit. In 1986 Tyson converted to a double shift operation, processing 92 birds per minute per shift; this change was made in anticipation of increasing production capacity to 140 birds per minute per shift.

(C)

On November 28, 1986, the citizens sent notice to all parties, as required by 33 U.S.C. § 1365(b)(1)(A), of their intent to sue Tyson and the City pursuant to the CWA. After the action was commenced, the EPA commenced a separate environmental enforcement action. On November 25, 1987, Work filed a motion in the EPA action seeking intervention as of right and seeking consolidation. On December 3, 1987, the court denied the motions. Work did not appeal immediately from the order denying these motions.

On January 28, 1989, after engaging in settlement negotiations, the government lodged a proposed consent decree with Green Forest. An opportunity for public comment was provided. On March 17, Work filed a second motion to intervene in the government action. On March 24, the court again denied the motion. On March 29, the court approved the proposed consent decree. On April 20, Work filed a notice of appeal from the orders denying their motions to intervene of December 3, 1987 and March 24, 1989.

The separate citizens' action proceeded to trial. On April 12, 1989, the court entered partial summary judgment in favor of Green Forest, dismissing Work's CWA claims. The court found that the approved consent decree between the EPA and Green Forest precluded the citizens from pursuing their CWA claims. On May 12, after a six-week trial, the jury returned a verdict against Tyson for $254,401.50 on Work's common law claims and found Tyson guilty of 43 CWA violations. On June 16, the citizens moved for assessment of CWA penalties against Tyson. On June 19, judgment was entered in favor of the City and against Work, and in favor of Work and against Tyson for common law damages. On June 29, Tyson moved for judgment n.o.v. This was denied on August 24, at which time the court assessed $43,000 against Tyson for CWA violations. Judge Harris' opinion assessing penalties is published at *Work v. Tyson Foods, Inc.,* 720

F.Supp. 132 (W.D.Ark.1989). On September 7, Tyson moved for reconsideration, for judgment n.o.v., or for a new trial. Those motions were denied on November 28.

## II.

### (A)

■ We turn first to the threshold question of our jurisdiction to entertain Work's appeal, filed April 20, 1989, from the denial of two motions to intervene in the EPA action. Work claims that his motions for intervention should have been granted as of right. 33 U.S.C. § 1365(b)(1)(B) and Fed.R.Civ.P. 24(a)(1); *see also United States v. Metropolitan St. Louis Sewer Dist.*, 883 F.2d 54, 56 (8th Cir.1989) (holding that the CWA conferred upon a citizens' group intervention as of right).

■ It is well-settled that an order denying a motion to intervene as of right is a final appealable order. *Brotherhood of R.R. Trainmen v. Baltimore & O. R.R.*, 331 U.S. 519, 524 (1947); *Corby Recreation, Inc. v. General Elec. Co.*, 581 F.2d 175, 176 n. 1 (8th Cir.1978); *Sellers v. United States*, 709 F.2d 1469, 1471 (11th Cir. 1983).

A notice of appeal from such an order must be filed within sixty days. Fed.R. App.P. 4(a)(1). In the instant case, the notice of appeal from the denial of the first motion to intervene was not until after nearly sixteen months. Since an appellate court lacks jurisdiction over an untimely appeal, *United States v. Metropolitan Dist. Comm'n*, 865 F.2d 2, 4 (1st Cir.1989), we lack jurisdiction over the December 3, 1987 order denying intervention.

■ The appeal from the second order presents a closer question. On its face, the appeal was filed timely: the order was entered March 24, 1989 and the appeal was filed April 20. Relying largely on *Hodgson v. United Mine Workers*, 473 F.2d 118 (D.C.Cir.1972), however, appellees claim that the second motion "was merely a back door attempt to revive the trial court's earlier order so as to start the time for appeal running anew."

In *Hodgson*, the district court denied the appellant's first motion to intervene as of right on March 10, 1972. On June 20, the district court denied appellant's second motion to intervene. The appellant timely appealed the denial of the second motion. 473 F.2d at 122–23. On appeal, the court held that "the question of jurisdiction must be resolved by ascertaining whether the June 20 order ... was merely a reinstatement of the court's March 10 ruling or whether it constituted a new determination by the District Court reached under circumstances materially changed from those existing in March." *Id.* at 125. The court went on to say that "[i]f the later order was only an attempt to revive the earlier order, it did not start the time for appeal all over again." *Id.* Ultimately, the court held that there were "changed circumstances" such that "the June 20 order ... constituted a fresh evaluation of the intervention application, well within the discretionary power of the District Court to make, and amenable to review on the merits by this court." *Id.* at 126–27.

Here, too, we find that the context in which the citizens sought intervention on March 17, 1989 was different from the context in which intervention and consolidation had been sought on November 25, 1987. By March 17, 1989, there was a proposed consent decree between the EPA and the City. In their second motion, the citizens made specific reference to the proposed settlement and articulated their specific objections to the consent decree as well as their concern (which was later confirmed) that it would be the basis for defendants' moving for dismissal of the citizens' action on the ground of collateral estoppel. Although the citizens had expressed concerns about possible settlement sixteen months earlier, the settlement possibility, in 1987, was merely inchoate. Consistent with *Hodgson*, we hold that the existence of the proposed consent decree resulted in a change in circumstances that made a renewed motion for intervention legitimate.

### (B)

■ Since we find it appropriate to exercise jurisdiction over the appeal from the

March 24, 1989 order, we hold that the court erred in denying the citizens leave to intervene, since the CWA expressly provides for intervention as of right. *Metropolitan St. Louis Sewer Dist., supra*, 883 F.2d at 56. Since we find, however, that the district court's denial of the motion, for the most part, was harmless error, we reverse and remand on that issue only for the limited purpose of permitting the citizens group to seek attorneys' fees.

Although Judge Harris denied Work's formal intervention order, the citizens, *de facto*, were permitted to participate. As Judge Harris stated in his order, the citizens had the opportunity, of which they took advantage, to file their objections to the consent decree during the available public comment period. There is little else that they could have done had they formally intervened. *United States v. Ketchikan Pulp Co.*, 430 F.Supp. 83, 85 (D. Alaska 1977) (holding that "once intervenors have been given the opportunity to object to the decree they have had an appropriate day in court and a judgment on consent may be entered"). In that case, a consent decree under the CWA was entered over objections of environmental groups.

In denying the citizens' motion to intervene, Judge Harris relied explicitly on our decision in *DuBois v. Thomas*, 820 F.2d 943 (8th Cir.1987). There we held that the district court was without subject matter jurisdiction to entertain a citizens' action commenced to compel the EPA to take investigatory and enforcement action, duties which we held were discretionary rather than mandatory. Although Judge Harris' reliance on *DuBois* in denying the citizens' intervention motion was somewhat misplaced, as a practical matter, *DuBois* supports our holding that the error here was largely harmless. That is so because commencing an enforcement action against Green Forest in the first instance was a discretionary rather than mandatory duty. Hence, ultimately settling the action also was within the EPA's discretion. Had the citizens intervened, they still would not have been able to compel a consent decree on their own terms. As we said in *DuBois*, the CWA "was not intended to enable citizens to commandeer the federal enforcement machinery." *Id.* at 949.

The citizens assert, however, that the denial of the intervention motion robbed them of their right to seek attorneys' fees. They point out that the citizens' suit predated the EPA action, and that their efforts were instrumental in spurring the EPA into finally taking action against the City. This has some force. We agree that the citizens should be permitted to seek their fees.

Accordingly, while we will not second-guess the terms of the consent decree itself, we reverse the denial of intervention insofar as it precluded the citizens from seeking their fees, and we remand the case on this issue for the district court to determine the proper amount of such fees.

### III.

■ We turn next to the citizens' appeal from the district court's denial of their motion to consolidate. Work asserts that, since there was little or no difference between the issues presented in both actions, their motion to consolidate should have been granted.

Although Work failed to designate that the citizens were appealing from the denial of the motion to consolidate as well as the denial of the motion to intervene, that omission was not prejudicial to appellees. Notices of appeal are to be liberally construed. Fed.R.App.P. 3(c); *McGowne v. Challenge–Cook Bros., Inc.*, 672 F.2d 652, 659 (8th Cir.1982). We have jurisdiction to review the court's denial of consolidation on the merits.

Pursuant to Fed.R.Civ.P. 42(a), a district court "may order" consolidation. The order denying Work's motion to consolidate should not be disturbed unless it is determined that the court clearly abused its discretion. *Shump v. Balka*, 574 F.2d 1341, 1344 (10th Cir.1978); *Gentry v. Smith*, 487 F.2d 571, 581 (5th Cir.1973); 9 Wright & Miller, Federal Practice and Procedure § 2383 (1971); *see also Chicago, Rock Island & Pacific R.R. v. Williams*, 245 F.2d 397, 404 (8th Cir.), *cert. denied*,

355 U.S. 855 (1957) (discussing court's discretion pursuant to Rule 42(b)). The record here supports the district court's denial of the motion to consolidate. The citizens sought punitive damages, compensatory damages for personal injuries, and relief for many common law tort claims. These claims were not relevant to the EPA action. Moreover, the citizens' claims were to be tried before a jury, while the EPA action was to be tried before the court.

We hold that, in denying Work's motion to consolidate, the court properly exercised its discretion in the interests of expedition and economy.

## IV.

We turn now to the CWA claims raised by both Work and Tyson.

### (A)

■ First, the citizens assert error in that they never had a chance to present their CWA claims against Green Forest. The district court found that the citizens were precluded, by the doctrines of res judicata and collateral estoppel, from pursuing their CWA claims. We agree that res judicata barred these claims.

The doctrine of res judicata was articulated in *Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir.1983), in which we explained that

"The doctrine of res judicata bars a later suit when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involved the same cause of action; and (4) both suits involved the same parties or their privies.... [B]oth [collateral estoppel and res judicata] are applied only when the party against whom the earlier decision is being asserted had a 'full and fair opportunity' to litigate the issue in question."

Work concedes that the CWA claims made in the citizens' suit were the same as those made by the EPA. He argues, however, that, since the citizens were not involved in the action that resulted in the consent decree, they should not have been precluded from pursuing their CWA claims independently. We disagree.

The citizens' action provision of the CWA casts the citizen in the role of a private attorney general. *Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1131 n. 5 (11th Cir.1990). As the Supreme Court stated in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987), however, the CWA was intended to be enforced primarily by the government:

"The bar on citizen suits when governmental enforcement action is underway suggests that the citizen suit is meant to supplement rather than supplant governmental action. The legislative history of the Act reinforces this view of the role of the citizen suit. The Senate Report noted that '[t]he Committee intends the great volume of enforcement actions to be brought by the State,' and that citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'"

(quoting S.Rep. No. 92–414, p. 64 (1971), *reprinted in* 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973)). In *Gwaltney* the Court held that citizen suits could not be brought for wholly past violations of the Act, stating that permitting such suits "could undermine the supplementary role envisioned for the citizen suit." *Id.* at 60; *see also DuBois, supra,* 820 F.2d at 949 (the CWA allows citizens to *supplement* government enforcement power).

In this case, we are faced squarely with the question whether citizens' claims brought prior to a government action are properly dismissed when a consent decree is entered in a later-filed EPA action. Recognizing the preeminent role that government actions must play in the CWA enforcement scheme, we hold that they are.

The preclusive effect of a consent decree on a private enforcement action was addressed by the court in *United States v. Olin Corp.*, 606 F.Supp. 1301 (N.D.Ala. 1985). There, the State of Alabama and the United States sought injunctive relief

to require the Olin Corporation to eliminate DDT from, and restore the environment in, the vicinity of Redstone Arsenal. As part of the resolution of the case, Olin, the United States, and Alabama entered into a consent decree.

The court stated that "once a state represents all of its citizens in a *parens patriae* suit, a consent decree or final judgment entered in such a suit is conclusive upon those citizens and is binding upon their rights." *Id.* at 1304. The court held that the question whether the citzens' suit was barred by res judicata turned on whether the prior litigation was a *parens patriae* suit. "In a proper *parens patriae* suit, the state or federal government is deemed to represent all of its citizens.... Traditionally, *parens patriae* lawsuits involved a government suing to enjoin alleged nuisances caused by water or air pollution." *Id.* at 1305. The court held that the plaintiffs' suit for injunctive relief was barred by res judicata because the same relief had been sought in the action brought by Alabama and the United States in a *parens patriae* capacity. *Id.* at 1308; *see also Student Pub. Interest Group, Inc. v. Georgia–Pacific Corp.*, 615 F.Supp. 1419, 1432 (D.N.J.1985) ("The consent judgment which resolved the previous lawsuit against defendant forecloses subsequent litigation as to all claims adjudicated therein.").

In this case, the citizens place great emphasis on the fact that their action was commenced prior to the EPA enforcement action; they suggest that because the CWA expressly provides that citizens cannot commence an action before giving the EPA sixty days notice, 33 U.S.C. § 1365(b)(1)(A), the failure of the EPA to commence an enforcement action within that time frame means that "the subsequent filing of an enforcement action by the Government could not supplant the citizen enforcement action already pending." We recognize that there may be some cases in which it would be appropriate to let a citizens' action go forward in the wake of a subsequently-filed government enforcement action. In view of the consent decree in the instant case negotiated by the EPA

and Green Forest, however, this is not such a case.

Some lower courts in other circuits have reached a result contrary to the one we reach today. *E.g., Atlantic States Legal Found., Inc. v. Koch Refining Co.*, 681 F.Supp. 609, 614 (D.Minn.1988) (holding that district court had "no discretion" to dismiss a properly filed citizen suit when a government enforcement action was later brought covering the same claims); *Sierra Club v. Coca–Cola Corp.*, 673 F.Supp. 1555 (M.D.Fla.1987) (consent decree entered into by the EPA and the defendant did not require dismissal of the Sierra Club action for the same CWA violations when the Sierra Club, a third party in the case, did not consent). In view of the preeminent role that must be afforded the EPA in enforcing CWA violations—a role contemplated by the legislative history and recognized by the Supreme Court in *Gwaltney*—we hold that it was proper for the district court to dismiss Work's CWA claims against Green Forest after the latter had entered into a consent decree with the EPA. The EPA is charged with enforcing the CWA on behalf of all citizens. Since citizens suing under the CWA are cast in the role of private attorneys general, as a practical matter there was little left to be done after the EPA stepped in and negotiated a consent decree. See our discussion under Part II(B), *supra*. Fines recoverable pursuant to the CWA are payable to the United States Treasury and would not have been recovered directly by the aggrieved citizens had their action continued. While the citizens might have preferred more stringent terms than those worked out by the EPA, such citizens are no more aggrieved than citizens who are precluded from commencing an action in the first instance because of pending agency action.

Although the issue was not framed in terms of res judicata or collateral estoppel, the comments of the Southern District of New York in *Hudson River Fishermen's Ass'n v. County of Westchester*, 686 F.Supp. 1044 (S.D.N.Y.1988) are instructive. Responding to "HudFish's" argument that dismissal of its citizens' action

would leave the group without a remedy, the court stated:

"We are particularly unimpressed with this latter argument. The thrust of the CWA is to provide *society* with a remedy against polluters in the interest of protecting the environment. Section 101 of the CWA, 33 U.S.C. § 1251(a). If the Government's action achieves that end, the fact that HudFish or any other private attorney general is barred from duplicating that effort should hardly seem surprising or harsh. The Government, of course, as representative of society as a whole, usually is in the best position to vindicate societal rights and interests. In those instances where, for whatever reasons, the Government fails or declines to take action, the CWA allows citizens acting as private attorneys general to fill the void. That does not mean, however, that HudFish is *ipso facto* entitled to its own, 'personalized' remedy in this or any other CWA case."

*Id.* at 1052.

It should be borne in mind that the citizens in this case were permitted to prosecute their CWA claims against Tyson, as well as their common law claims against both Tyson and the City. It was only the CWA claims that the district court found to be barred by res judicata and collateral estoppel.

We hold that that ruling was proper.

**(B)**

■ Tyson's claim that the court erred in refusing to dismiss claims against *it* based on res judicata, however, need not detain us long. In essence, Tyson asserts that the EPA's decision *not* to commence an action against it is binding upon the citizens. This novel proposition flies in the face of the clear language of the citizens' action provision of the CWA, as well as the legislative history, which make clear that agency inaction is precisely the circumstance in which private action is appropriate. *Student Pub. Interest Research Group, supra,* 615 F.Supp. at 1427 ("Defendant's interpretation of the Act would render citizen suits impossible when they are required

most: instances where an agency encourages a polluter to believe its unlawful behavior will go unpunished.").

**(C)**

■ We next address Tyson's argument that its motion to dismiss should have been granted because of the lack of regulatory definitions of "interference" and "pass-through." See our discussion of the statutory framework of the CWA, under part I(A), *supra.*

The CWA regulations provide that "[a] User may not introduce into a POTW any pollutant(s) which cause Pass Through or Interference." 40 C.F.R. § 403.5 (1989). Tyson relies on the holding in *NAMF, supra,* 719 F.2d at 640–41, *rev'd on other grounds sub nom. Chemical Mfrs. Ass'n v. N.R.D.C., Inc., supra,* 470 U.S. 116, to support its contention. Tyson misreads the holding in *NAMF.* As we have pointed out, *NAMF* merely held "that liability could not be imposed on industrial users without proof of causation." *Arkansas Poultry Fed'n v. EPA,* 852 F.2d 324, 328 (8th Cir. 1988). The *NAMF* court rejected a definition of "interference" that would have created liability for causing *or* "significantly contribut[ing]" to a violation of an NPDES permit, 719 F.2d at 639, holding that:

"We conclude that given the language and purpose of the Act, an indirect discharger cannot be liable under the prohibited discharge standard unless it is a cause of the POTW's permit violation or sludge problem. *If the definition of 'interference' required that an indirect discharger be both 'the cause of' and 'significantly contribute to' the POTW's permit violation, it would be consistent with that causation requirement.* As written, however, the definition fails to require such causation, and thus violates the clear meaning of the Act."

*Id.* at 641 (emphasis added).

While the *NAMF* court rejected the then-existing regulatory *definitions* of "interference" and "pass-through," 719 F.2d at 641, the regulatory *prohibitions,* as Work points out, remained intact. We agree with

the citizens that the CWA's prohibitions against "interference" and "pass-through" are not unconstitutionally vague, but adequately apprised Tyson that it was not to cause the City to violate its NPDES permit.

We hold that the district court properly denied Tyson's motion to dismiss.

### (D)

■ We next address Tyson's claim that the district court erred in denying its motion for a directed verdict pursuant to *Gwaltney, supra,* which held that citizens' actions are not permitted for wholly past violations of the CWA. 484 U.S. at 59. Tyson points out that it constructed an advanced pretreatment facility at substantial expense, which went on-line in 1985, subsequent to which Tyson claims it "never exceeded the agreed local limits designed for optimum operation of the POTW."

The citizens assert that violations of the City's permits continued after 1985. Work asserts further that Tyson's reliance on the affirmative defense of compliance with local limits does not get Tyson off the hook. CWA regulations provide for an affirmative defense for compliance with a local limit if that limit was *designed to prevent pass through and/or interference,* 40 C.F.R. § 403.5(a)(2)(ii)(A) (1989), and if the POTW user "did not know or have reason to know that its Discharge, alone or in connection with discharges from other sources, would cause Pass Through or Interference". *Id.* at § 403.5(a)(2)(i). We agree with Work that Tyson has not established these conditions.

*Gwaltney* makes clear that the citizens' suit provision "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation...." 484 U.S. at 64. Judge Harris, in this case, explicitly found that "[a] review of the plaintiff's second amended complaint makes it indelibly clear that the plaintiffs have made good-faith allegations of ongoing violations by Tyson." *Work, supra,* 720 F.Supp. at 137. The judge found, moreover, that there was "substantial evidence adduced at trial establishing a reasonable likelihood of a re-currence of intermittent violations before and since November 1985 when Tyson's new treatment facility began operating...." *Id.* at 138. Our review of the record discloses no reason for disturbing Judge Harris' finding in this regard.

We hold that the district court properly denied Tyson's motion for a directed verdict.

### (E)

■ Tyson also claims that the court erred in instructing the jury on discharger liability under the CWA. True, two of the instructions given by Judge Harris—those relating to direct discharger liability and liability applicable to NPDES permit holders—were wholly irrelevant to this case. Tyson is an indirect discharger and thus could not be liable pursuant to those theories.

We hold, however, that this error was cured when Judge Harris subsequently gave the jury the proper instruction on indirect discharger liability. The judge stated:

"Also, if you find by a preponderance of the evidence that Tyson Foods, Inc. has violated the Clean Water Act by causing the City of Green Forest, Arkansas, to violate a provision of its Clean Water permit, you must determine the number of occasions on which Tyson has violated the Clean Water Act.

In order to make this determination, you must determine how many violations by the City of its Clean Water Act permit were caused by Tyson Foods, Inc."

The evidence adduced all related to Tyson's role as an indirect discharger. The jury's verdict was consistent with the instructions given by the judge with respect to indirect discharger liability. In *EEOC v. Atlantic Community School Dist.,* 879 F.2d 434, 437 (8th Cir.1989), we explained that "[j]ury instructions are subject to the 'harmless error' rule requiring a determination of whether the error affected the 'substantial rights of the parties.'" (citations omitted).

We hold that in this case the judge's error in giving superfluous instructions relevant only to direct dischargers and permit holders was harmless, in light of his correct instruction on indirect discharger liability.

(F)

██ This brings us to Work's claim that the district court erred in assessing $43,000 in penalties against Tyson for CWA violations. The jury found Tyson guilty of 43 separate violations. The court assessed penalties in the amount of $1,000 per violation. *Work, supra,* 720 F.Supp. at 139.

Work claims that the district court erred in declining the citizens' request to instruct the jury that a violation of a thirty-day average effluent limitation constitutes thirty separate daily violations of the Act. *Atlantic States Legal Found., supra,* 897 F.2d at 1139. We agree with the majority of the courts that have addressed the issue that violation of a monthly average effluent should be counted as thirty separate violations. *Id.* at 1139. We find, however, that the district court's failure specifically to articulate this rule in its jury instructions in this case was harmless error.

In *Atlantic Community School District, supra,* we held that the district court's failure to give a proposed instruction did not affect the relevant party's "substantial rights":

"Because EEOC's theory of the case was apparent to the jury throughout the trial, and because the instructions given neither failed to guide the jury on the central issue of age discrimination nor inhibited the jury in making such a finding, error in failing to give the proposed instruction, if error there were, would have been harmless. In sum the jury could have, but simply chose not to, agree with EEOC's theory of the case."

879 F.2d at 437 (citation omitted).

In this case, too, the jury could have agreed with Work that Tyson was guilty of many more than 43 violations of the CWA. The court simply instructed the jury that it was required to "determine how many violations by the City of its Clean Water Act

permit were caused by Tyson Foods, Inc." Work's expert testified at trial that there were 720 violations "assuming that a violation of the 30–day average permit for administrative order requirement is tantamount to 30 separate daily violations. . . ." As Tyson points out, however, there also was evidence from which the jury could have concluded that the problems with the POTW were primarily the fault of the City rather than Tyson. Furthermore, the jury had before it reports of discharges calculated on a daily, weekly, and monthly basis.

In the district court's opinion, where, *inter alia,* it assessed penalties against Tyson, the court stated that it "construe[d] the decisions of the jury to be that there were violations on *43 separate days.*" *Work, supra,* 720 F.Supp. at 138 (emphasis added). Earlier in that opinion, the court stated that it had heard and had the benefit of the entire record in the case. *Id.* at 137. The opinion indicates, moreover, that the court considered the law applicable to the assessment of penalties. For example, in the section addressing *Gwaltney,* the court referred to the Fourth Circuit's holding that each violation of monthly averages for discharge of pollutants amounts to a violation for each day of the month. *Id.* at 135.

We find no reason to disturb the court's construction of the jury award; nor do we find that its failure to use Work's proffered jury instruction was anything other than harmless error, if indeed it was error at all. The jury was made aware, through counsel's questions, that it could find more than 700 violations of the CWA if it so chose. Although we would be more comfortable with the jury instructions if the court had clearly articulated the rule with respect to monthly average permit violations, its failure to do so was at most harmless error.

Work argues further, however, that the court erred in assessing only a $1,000 fine per violation. We disagree. We hold that the assessment was within the proper exercise of the court's discretion.

Work relies almost exclusively on the Eleventh Circuit's decision in *Atlantic States, supra,* for the proposition that the

district court erred in failing to assess higher penalties. In *Atlantic States*, the court of appeals held that the district court abused its discretion in levying no penalty whatsoever against the defendant after violations of the CWA had been established. The court stated that "[w]hile the amount of penalty to be levied is discretionary with the district court, its determination, based solely on the good faith efforts of [the defendant] to comply with the law, that no penalty was appropriate was and would be an abuse of discretion." 897 F.2d at 1142. The court remanded the case to the district court with the direction that, if it chose not to impose the maximum penalty under the Act, it "reduce the fine *in accordance with the factors spelled out in section 1319(d)*, clearly indicating the weight it gives to each of the factors in the statute and the factual findings that support its conclusions." *Id.* at 1142 (emphasis added). In the instant case, unlike in *Atlantic States*, the court did impose a penalty after considering, in substance, the matters contemplated by 33 U.S.C. § 1319(d).

Section 1319(d) provides that violators shall be subject to a maximum penalty of $10,000 for violations before February 4, 1987 and $25,000 for violations thereafter. It also provides that:

"In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and any such other matters as justice may require."

33 U.S.C. § 1319(d).

In its opinion addressing penalties, the district court here explicitly considered "the extent of violations as well as the number of violations through the years"; "[a]bility to pay and litigation considerations"; and "the policy by EPA in arriving at just and reasonable penalties under the statute." *Work, supra,* 720 F.Supp. at 138–39. The court also stated that:

"Defendant Tyson has strongly contended that a new facility of the defendant was undertaken and is now in place, operating to alleviate the previous violations at a cost in excess of a million dollars. The defendants insist that the flow of wastewater from its plant through the facility of Green Forest would prove [sic] and has already without question alleviated the previous violations."

*Id.* at 138.

The district court, in its opinion, relied on the old version of § 1319(d), which was in effect at the time the citizens' action was commenced. 720 F.Supp. at 135. At the time the court assessed penalties, that section had been amended to provide for higher penalties and to provide specific factors, set forth above, for district courts to consider when assessing penalties. While not referring to the new § 1319(d), however, in essence the court considered precisely those factors Congress found appropriate —i.e., defendant's conduct, good faith, and financial situation.

We hold that the court's failure precisely to invoke the talismanic language of the new § 1319(d) does not rise to the level of reversible error. We affirm the court's assessment of CWA penalties.

We have considered the parties' other claimed errors with respect to the CWA, and we find them to be without merit.

### V.

■ We turn next to Work's claimed errors with respect to various evidentiary rulings made by the district court, relevant to both the CWA and common law claims. Work claims that the court erred in applying a "statute of limitations" to the evidence that it permitted to be introduced in Work's case against Tyson. The statute of limitations for CWA violations is five years. The court excluded evidence predating that period. Work also claims error in that the court excluded evidence of a settlement in prior litigation reached between Franz Foods (Tyson's subsidiary) and some of the citizens in the instant case.

Work points out that the evidence of prior violations was relevant to such issues as Tyson's knowledge and culpability, even if Tyson could not be held liable for violations pre-dating the statute of limitations period. Furthermore, he points out that, pursuant to Fed.R.Evid. 408, a settlement can be introduced in evidence for purposes other than to show liability.

Work is right that there is no rule that automatically excludes evidence pre-dating a statute of limitations period. In this case, it may have been error for the court automatically to exclude considerable evidence that was relevant to Tyson's culpability. Most of the evidence that Work complains should have been admitted, however, was relevant primarily for determining punitive damages. As stated below, we are remanding the case for the purpose of deciding the issue of punitive damages. To the extent the evidence was not admitted where it might have had some tangential relevance to other claims, however, we hold that the error was harmless, particularly since the evidence would have been largely cumulative with respect to many of Work's claims for relief. As for the admissibility of such evidence, we have made it clear that "[e]ven with a clear showing of abuse, the error must have affected the substantial rights of the parties to warrant reversal of the district court." *Hogan v. American Tel. & Tel. Co.*, 812 F.2d 409, 410 (8th Cir.1987). Any such error in the instant case did not rise to that level.

■ With respect to the exclusion of the settlement agreement, suffice it to refer to "our rule that the trial court's ruling on the admissibility of evidence will not be disturbed absent a clear and prejudicial abuse of discretion." *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir.1981), *aff'd sub nom. Smith v. Wade*, 461 U.S. 30 (1983). The exclusion of the settlement agreement was well within the court's discretion.

## VI.

This brings us to Work's claimed errors with respect to the trial of the common law claims.

(A)

■ Turning first to the directed verdict against an award of punitive damages, a review of the record makes clear that the court was under a misapprehension of the law with respect to the relevant Arkansas law. The court stated that:

"Punitive damages is a harsh rule of law.

. . . .

You've got the intent of intentional injury, and I don't think there's any testimony in any of this record at all that would serious [sic] contend that Green Forest or Tyson in their own mind and heart were going to do this intentionally just to punish. If you can show me any testimony otherwise, I probably could be persuaded."

The judge's view that a directed verdict was appropriate because Tyson did not "intentionally" pollute "just to punish" was error as a matter of Arkansas law.

We recently summarized Arkansas law on punitive damages and explained that the issue had been properly submitted to the jury in a case involving exposure to chemicals:

"For punitive damages to be awarded under Arkansas law, the plaintiffs must show malice, either express or inferred. Inferred malice requires that the defendant knew or should have known of the potential harm, but proceeded anyway with conscious indifference to the possibility of injury. Witnesses testified at trial that Dow knew of the dangers of DBCP as early as 1961, and yet did nothing. Open cans of DBCP were dumped in open waste pits, and the smell of the chemical was repeatedly detected in the plant. Dow took no precautions to protect its employees. This evidence was sufficient to justify submitting the punitive damages issue to the jury."

*Loudermill v. Dow Chemical Co.*, 863 F.2d 566, 571 (8th Cir.1988). Under Arkansas law, knowledge and indifference are enough for punitive damages. The Arkansas Supreme Court expressly has held that a deliberate intent to injure is not required.

*National By–Products v. Searcy House Moving Co.*, 292 Ark. 491, 494, 731 S.W.2d 194, 195–6 (1987).

In this case, the fact that Tyson may not have intended to "punish" the citizens is not dispositive of the punitive damages issue. There was evidence from which the jury could have inferred that Tyson knew the risk involved in drinking water because of its chicken operations, and yet Tyson acted for years with indifference to that risk.

We hold that the court erred in directing a verdict against an award of punitive damages and we remand the case for determination of that issue. In re-trying that issue, the court should consider carefully the admissibility of evidence predating the applicable statute of limitations period and should exclude evidence only if its prejudicial value outweighs its probative value. Fed.R.Evid. 403.

#### (B)

■ We next address the citizens' contention that the court erred in directing a verdict against Patricia Hudson and against the medical claims of ten citizens. We hold that the court erred in this respect.

Hudson's claim was for alleged damage to real property. Counsel for Tyson asserted that "the credible testimony in the record is that she received fair market value [for her property] without regard to any alleged pollution." Hudson, however, had testified at trial that water pollution had devalued her land by $69,000—the difference between what she and her husband paid for the property and what they ultimately sold it for. In arguing against Tyson's motion for a directed verdict, counsel for the citizens pointed out that there was evidence on both sides, and that the question of property damage should be left for the jury. The court, however, ruled that "on the question of credibility, I will grant the motion."

■ The court clearly usurped the jury's role in ruling on Tyson's motion. We have made it clear that, in ruling on a motion for a directed verdict, the court should consider only evidence favoring the non-moving party. *Dace v. ACF Indus.*, 722 F.2d 374, 376 (8th Cir.1983). Granting such motions is appropriate only where the evidence is such that, *without weighing the credibility of the witnesses*, there can be but one reasonable conclusion as to the verdict. *Mulholland v. Schneider Service Co.*, 661 F.2d 708, 711 (8th Cir.1981). In the instant case, the court explicitly considered credibility in granting Tyson's motion. Indeed, credibility was the very basis for his ruling.

In view of this clear error, which prejudiced Hudson, we are compelled to reverse and remand to the district court for reconsideration of Hudson's claim.

■ Similarly, we hold that it was error for the court to have directed a verdict to deny the medical claims of ten of the citizens. The citizens testified as to medical complaints and also adduced the evidence of a medical doctor. The defendants presented no rebuttal evidence. The court, however, ruled: "The Court thinks there's just not enough testimony in this record to justify a jury taking the time to determine whether or not they're entitled to damage because they had the stomach ache and diarrhea. Who doesn't have it occasionally?"

We hold that the court usurped the jury's function. The medical claims should have been submitted to the jury. We remand with instructions that the court do so.

#### (C)

■ We turn next to Work's claims of error with respect to the court's instructions on inverse condemnation and property damage. The citizens claim that the court erred in instructing the jury that the plaintiffs had the burden of proving "that the City of Green Forest knew by its discharge of wastewater into Dry Creek it was taking the property...." According to Work, "[i]t is sufficient that the City took some action which had the *effect* of taking the property. The City's intent or knowledge is not determinative." We agree.

The citizens rely on the Arkansas Supreme Court's recent decision in *Robinson v. City of Ashdown*, 301 Ark. 226, 783 S.W.2d 53 (1990), for the proposition that intent or knowledge *is irrelevant* to the issue of taking. The City relies on the same case for the proposition that knowledge or intent *is essential.*

*Robinson* involved a claim for inverse taking where the plaintiffs' home had been flooded intermittently with effluent from the city's sewer system over a nine-year period. There was no question that the city was aware of the problem. The Arkansas Supreme Court was presented with the question whether "instances of negligence, with respect to which the city has immunity from suit, may, if sustained a long time, amount to inverse condemnation." *Id.* at 227–28, 783 S.W.2d at 54. The court held that the sustained negligence did constitute an inverse taking. *Id.* at 228, 783 S.W.2d at 54.

The evidence in this case indicates that the City allowed excessive levels of effluent to enter Dry Creek for decades. The *Robinson* court explicitly stated that negligence, sustained over a long period of time, can be the basis of an inverse condemnation claim. The facts of *Robinson* do not indicate that the City in that case ever intended to take the property. Green Forest's reliance on the statement in Robinson that a municipality is liable when "its actions are shown to be intentional," *id.* at 232, 783 S.W.2d at 56, is misplaced. That statement does not mean that the City must have intended to take the property. Such an interpretation would contradict the holding of the case. That passage simply requires that the City intended its action, not the results of its action. The *Robinson* case controls our decision and requires that the citizens be allowed a new trial on their damage claims for inverse condemnation.

On remand, the district court is instructed to correct other errors, pointed out by the citizens and discussed below, with respect to its instructions on inverse condemnation and property damage (which errors, standing alone, might not have compelled reversal were it not for the fatal error with respect to the issue of intent).

■ The court erred in stating that the citizens had to show "that the taking of property occurred on or after March 3, 1984." Although it was proper for the court to apply a three-year statute of limitations to the taking claims, the Arkansas Supreme Court has made clear that the limitations period begins to run only " 'at the time when it becomes obvious that a permanent injury has been suffered.' " *City of Springdale v. Weathers*, 241 Ark. 772, 774, 410 S.W.2d 754, 756 (1967) (citation omitted). The court's instruction here did not make this clear.

■ We also find that it was error for the court to have instructed the jury that it was to consider "enhancement of the property, if any, to the value of such plaintiff's land which resulted from the extension of the city water to such property." The citizens are correct that it was proper for the jury to have considered only any enhancement that *was the direct result of a taking, e.g., McMahan v. Carroll County*, 238 Ark. 812, 384 S.W.2d 488 (1964). The extension of city water here was not such an enhancement. This error should be corrected with regard to plaintiffs' claims against Tyson as well as the City.

## VII.

To summarize:

We hold that we are without jurisdiction to consider the denial of Work's first motion to intervene, but that we do have jurisdiction to consider the denial of the second intervention motion. Since the court erred in denying that second motion, we remand for consideration of attorneys' fees. We hold that the court properly exercised its discretion in denying Work's motion to consolidate. We hold further that the court properly dismissed the CWA claims against the City based on res judicata.

With respect to both parties' claimed errors relating to the trial of the CWA claims against Tyson, we affirm the judgment of the district court in its entirety, finding no prejudicial errors.

With respect to the trial of the common law claims against Tyson, we substantially

affirm but reverse and remand in part. We hold that the court erred in directing verdicts against Patricia Hudson, against the medical claims of ten citizens, and against the citizens on their punitive damages claims. On remand, the court is instructed to submit these claims to the jury. Specifically with respect to the punitive damages claim, the court is further instructed to make rulings on the admissibility of evidence consistent with Fed.R.Evid. 403.

With respect to the trial of the common law claims of inverse condemnation against the City, we reverse and remand based on the court's erroneous instruction on the issue of intent. On remand, the court is further instructed to correct other errors with respect to its instructions.

We have considered the parties' other claims of error, and find them to be without merit.

Affirmed in part, reversed in part, and remanded.

LAY, Chief Judge, concurring and dissenting.

I concur in part and dissent in part. I dissent as to the district court's determination of the number of Clean Water Act violations committed by Tyson.

I dissent with regard to the court's affirmance of the Clean Water Act penalty calculation against Tyson. The district court refused to give plaintiff's proposed instruction that would have explained to the jury that each monthly average violation must be construed as thirty individual daily violations. The majority concedes that the court erred in refusing this instruction, which is firmly rooted in the text of the Act. The jury found 43 violations, an erroneous figure that does not correspond to any view of the evidence. The district court admitted the verdict was ambiguous when the judge stated he had to "construe" the verdict to mean there were violations on forty-three separate days.

No doubt the faulty instruction confused the jury. There is nothing in the record that makes me confident that they determined the correct number of violations.

Perhaps too eager to avoid relitigation of this case, the majority simply declares the error harmless and attempts no analysis or explanation for its decision. The majority goes on to affirm the judge's penalty calculations, relying on the fact that the calculations are discretionary. The judge's discretion to set the amount of the penalty, however, does not carry over into the jury's province to determine the number of violations. The judge exercised his discretion to set the amount of penalty relying on the jury's determination of the number of violations. Had the jury found a different number of violations, the judge, if he was properly enforcing the Act, would have set a different penalty. Given the serious doubt about whether the jury properly determined the number of violations, we should not let the penalty calculation stand.